JOHN WRIGHT, Appellant, v. M. A. JOHNSTON, Appellee.

CORPORATIONS: What Constitutes Stock. The term "certificate of stock," as applied to a corporate instrument which contains conditions *which tend to impair the corporate capital available for the satisfaction of creditors,* is a misnomer. Said instrument is not a "certificate of stock," in any legal sense—is simply an evidence of a debt owing by the corporation. It follows that, as to such an instrument, the statutory regulation of the issuance of *stock* for property other than money, has no application. (See Sec. 1641-b, *et seq.,* Code Supp. 1913.)

PRINCIPLE APPLIED: Johnston purchased 50 corporate shares of common stock, and paid par value therefor in cash— $5,000. The corporation agreed to repurchase the stock if Johnston became dissatisfied therewith. Johnston did become dissatisfied, and the corporation repurchased, or took up, said stock, by paying Johnston $2,000 in cash, and by issuing to him 30 shares, or $3,000, of what was called "preferred stock." This latter so-called stock was issued without any application to the executive council, as provided by Sec. 1641-b, Code Supp., 1913. This so-called "preferred stock" provided:

1. That, before any dividends were paid on common stock, the "preferred stock" should receive, out of the net profits, 8% cumulative dividends, payable semiannually. This 8% was the *limit* on right to receive dividends.

2. That the holder of "preferred stock," in case of dissolution, should receive, out of the assets of the corporation, and before the common stock received anything, par value of stock, plus unpaid dividends. *All* remaining assets belonged to the common stock.

3. That the "preferred stock" *might* be purchased by the corporation, on three months' notice, by paying par, plus unpaid dividends.

4. That the "preferred stock" *must* be purchased by the corporation after six months' notice, or in case four successive dividends were passed, by paying par, plus unpaid dividends.

5. That the holders of "preferred stock" were not to be deemed stockholders, and possessed no corporate vote.

Sometime after Johnston received his so-called "preferred stock," he called upon the company for payment or repurchase, in accordance with the terms of the certificate. Being refused payment, he brought suit. Sometime prior to this, Wright had become heavily interested in the corporation, and, to get rid of Johnston's suit, he purchased Johnston's 30 shares of "preferred stock." Later, Wright brought suit against Johnston, to recover what he had paid for the stock. His main theory was that Johnston's "preferred stock" was *void,* because issued without the authorization of the executive council, and, since it was void, he had suffered a total failure of consideration, and that Johnston should be held to an implied agreement to refund the money received for the void stock.

*Held,* that Johnston's so-called "preferred stock" was not stock at all—was merely an evidence of a corporate debt, which Wright, with full knowledge, had purchased; and that the statutes in question (Sec. 1641-b *et seq.,* Code Supp., 1913,) had no application to the case.

**PLEADING:** Issue, Proof and Variance—Issuance of Corporate 2 Stock. An issue on whether corporate stock was void because issued without authorization by the executive council (Sec. 1641-b *et seq.,* Code Supp., 1913), and because issued in excess of lawful authorization under its articles, necessarily involves the issue whether that which was issued was (a) *stock* or (b) merely evidence of a corporate debt.

*Appeal from Polk District Court.*—W. S. AYRES, Judge.

MAY 17, 1918.

SUIT to recover money paid for stock in the Des Moines Stationery Company, and to cancel a note given in part payment thereof, and require defendant to return to plaintiff a certain note and mortgage hypothecated as collateral security for the payment thereof. On hearing, the petition was dismissed. The plaintiff appeals.—*Affirmed.*

*Royal & Royal,* for appellant.

*William B. Brown,* and *Brammer, Lehmann & Seevers,* for appellee.

LADD, J.—I.  On April 24, 1915, plaintiff bought of defendant 30 shares of so-called preferred stock in the Des Moines Stationery Company, at the agreed price of $3,240,

**1. CORPORATIONS:**
**what consti-**
**tutes stock.**

paying $50 in cash and $540 in property, and giving his note for the balance of $2,650.  To secure the payment of this note, he put up a $2,800 note and mortgage as collateral security.  Since then, $400 has been paid on this note.  Plaintiff says that, to induce him to enter into the deal, defendant falsely represented that he held said shares of stock issued by the company, and that they were worth par value; that he relied thereon in making the purchase; and that the certificate for 30 shares of capital stock was void and the said representations of defendant untrue, as he well knew, when making them.  Recovery of the money paid, with interest, is prayed, together with the surrender of the note given and the collateral security.  The defendant alleged that he paid par value for the stock, denied having made any representations, and averred that plaintiff, as officer in charge of the books of the company, knew of its condition better than this defendant, and further pleaded that a part of the consideration for sale of stock was the settlement and dismissal of an action against the company for the par value of said stock with dividends.

Such are the issues, and a recital of the facts seems essential to a full understanding of the case.  The company was organized with capital of $50,000, divided into shares of $100 each, with the option of beginning business with 180 shares issued.  It did so in 1909, as soon as the required shares were disposed of, the same being paid by property valued at $7,898, and the remainder in cash.  On June 13, 1913, defendant entered into a contract with the company to purchase 50 shares of stock, on condition that the company

repurchase if he became dissatisfied within a year; and a certificate was issued accordingly, for which he paid $5,000, became vice-president, and received a salary of $100 per month. Defendant having become dissatisfied, it was arranged that he surrender this stock and receive in lieu thereof $2,000 in cash and 30 shares of preferred stock; and this was done, February 21, 1914. He then resigned as officer and director of the company, and ceased to be in its employment. In December of that year, suit was brought by defendant against the company for the face value of, and accrued interest on, the 30 shares of preferred stock. About March 1, 1915, following, Roovart, then president of the company, requested plaintiff to talk with defendant's attorney about the case, and he met both defendant and his attorney. It may as well be said here that the plaintiff had acquired from Roovart 75 shares of stock in the company, February 12, 1915, and, three days later, entered its employment as a clerk. According to his testimony, he made no investigation other than looking over the trial balances of Roovart, then president of the company, and the goods shown him on the shelves and in the basement. He did not examine the books, and paid no attention to daily sales, or whether bills were being paid.

After negotiating with defendant and his attorney, the purchase of the stock was made, as aforesaid, and the suit dismissed. A reading of the record has satisfied us that no fraud was practiced on plaintiff, and we do not understand error to be predicated on this phase of the case. On April 23, 1915, the day before the purchase of defendant's stock, Roovart resigned, and plaintiff succeeded him as president of the company, having discovered for the first time that Roovart had parted with all his stock. The record leaves no doubt that, up to this time, and until after the deal for the preferred stock and the dismissal of the suit, plaintiff was without information as to the financial condition of the company. This is somewhat confirmed by his purchase of 15 shares on March 30th previous, and nothing appears to have happened in the meantime to advise him differently. Soon

thereafter, he was awakened to the situation by the coming in of bills, with no money to meet them, and by Roovart's disposition of his interest. An expert accountant was employed to examine the accounts. His report was that, on February 13, 1915, the assets, computed at face value, amounted to $22,917.40, and the liabilities, to $18,329.32. The difference between these was reduced, by June 30th following, to $3,185.01. The books had been badly kept, and the inventory of January 1, 1915, inflated. That the company was unable to meet its bills as they became due, and that the actual value of its assets probably was not enough to satisfy its liabilities on April 24, 1915, the day the deal between the parties was closed, is not open to controversy.

II. When defendant purchased 50 shares of common stock, he paid par value therefor in cash, on June 3, 1913, and there were then outstanding 137 shares of common stock and 51 shares of preferred stock. At the time the defendant surrendered the 50 shares of common stock for $2,000 in money and 30 shares of preferred stock, February 21, 1914, there were, besides these, 150 shares of common stock, and 20 shares were issued to Roovart on that day, and 28 shares of preferred, issued and outstanding. On the day of the deal complained of, April 24, 1915, there were 155 shares of common stock, of which 75 were held by plaintiff, and 80 were in the name of one Coffin, and 26 shares of preferred stock were outstanding. Though the original issuance of the 50 shares of common stock to defendant overran the permissible issue at the time, all such stock was surrendered, and the entire issue was reduced to 150 or 170 shares, and there were but 172 of these shares outstanding at the time plaintiff acquired the 30 shares of preferred stock. If, then, the so-called preferred stock was not really stock at all, but merely an evidence of indebtedness, no liability for an over-issue of stock can be based thereon. Authority for issuing certificates of preferred stock is found in an amendment to the articles of incorporation, in words following:

"Amendment to Articles of Incorporation.

"Preferred stock, of the par value of $100 per share, not

exceeding in amount 25% of the par value of the common stock then outstanding, may be issued at any time by unanimous vote of the common stock then outstanding. Said preferred stock shall receive cumulative dividends at the rate of 8% per fiscal year, paid semiannually out of the net profits, but shall be entitled to no dividends after the 8% cumulative dividend shall have been paid. All unpaid dividends on the preferred stock shall be paid before unpaid dividends are paid on the common stock. In the event of the dissolution or liquidation of the corporation, the holders of the preferred stock shall receive the par value of their preferred stock, plus unpaid dividends thereon, out of the assets of the corporation, before the holders of the common stock receive any of said assets. Any surplus assets shall go to the holders of the common stock. The corporation may, at any time, convert a portion of its common stock into preferred stock, of the nature above described, but at no time shall the preferred stock exceed 25% of the par value of the common stock then outstanding. The corporation may purchase the preferred stock, or any portion thereof, at par, plus unpaid dividends thereon, at any time, upon giving 3 months' notice by mail to the holder or owner of said stock, as shown by the books of the company, and the corporation shall purchase said preferred stock, or any portion thereof, at par, plus unpaid dividends, upon 6 months' notice given the company by mail at any time after July 1, 1910, by the holder of such stock, or, in the event that four consecutive dividends on said preferred stock be passed, said corporation shall thereupon purchase said preferred stock at par, plus unpaid dividends thereon, within 6 months thereafter. No mortgage of any of the corporate assets shall be executed without the written consent of the holders of the preferred stock then outstanding. The word 'stockholders,' as used herein, shall refer to the holders of common stock only, and the holders of preferred stock shall not be entitled to vote."

Ordinarily, stock is said to be preferred when it is entitled to dividends from the earnings or income of the cor-

poration before any other dividends are paid. But such other conditions may be included as may be agreed upon, short of making the certificates something other than certificates of stock,—and that is precisely what has been accomplished by this corporation. The designation of stock as preferred does not make it such, nor define the rights of the holder thereunder. As remarked in *Heller, Hirsch & Co. v. National Marine Bank*, 89 Md. 602 (73 Am. St. 212) :

"Courts are not influenced by mere names. They look beyond these, and give to the subject dealt with the character—the status—which its properties denote it possesses. The qualities and properties of a thing are its essentials— they define and mark what it is—the name is purely accidental—it is no part of the thing named. If, then, the thing which the statute contemplates possesses the characteristics and qualities of preferred stock—*and possesses none other*— it is preferred stock; but if, on the other hand, it possesses characteristics and qualities that are entirely foreign to preferred stock, as strictly defined, and that are descriptive of something else, then the thing is obviously either not ordinary preferred stock, or not preferred stock at all, even though it be called preferred stock, and have, in addition to its own qualities, some of the characteristics that do pertain to preferred stock."

See, also, *Burt v. Rattle*, 31 Ohio St. 116. What the certificates are, as evidenced by their terms and the articles of incorporation authorizing their issuance, and not what they are denominated, must determine their character. It may be that, as between shareholders and the corporation, one class, as those having preferred stock, may be accorded preferences, as that dividends be first paid from the profits; and, if profits are not sufficient for this purpose, that cumulated dividends be first paid from the assets on liquidation after satisfaction of all indebtedness, and even that the par value be returned to preferred shareholders before any of the assets are distributed to the holders of common stock.

*Hamlin v. Toledo, St. L. & K. C. R. Co.,* 78 Fed. 664; *Lockhart v. Van Alstyne,* 31 Mich. 76; *Miller v. Ratterman,* 47 Ohio St. 141, 163 (24 N. E. 496); *Warren v. King,* 108 U. S. 389; *Wilson v. Parvin,* 119 Fed. 652; *In re Espuela Land & Cattle Co.,* 2 Ch. D. (1909) 187. It is largely a matter of contract, and, in the absence of statutory limitations, it seems that any condition may be included in one class of stock which does not tend to impair the corporate capital available for the satisfaction of creditors. The amendment to the articles under consideration and the preferred stock issued in pursuance thereof do this very thing. Though providing that dividends are to be paid from profits, and that, if not paid therefrom, unpaid dividends and par value of preferred stock are to be paid out of the assets before holders of common stock, preferred stockholders may not share in any surplus assets, and the right to vote is denied them. Not only is the corporation permitted to repay them the par value of their shares plus unpaid dividends, on three months' notice, but they may be compelled to do so, at the option of the shareholders; for it is stipulated that "the corporation purchase said preferred stock or any portion thereof on six months' notice, or in event of four consecutive dividends' being passed." Thus, the preferred shareholder neither participates in the management of the corporation or the assets, after being reimbursed money paid in and unpaid dividends. Though assured dividends, he is not allowed to share the profits. The only risk taken is that of his stock's being retired, at the option of the company or on his election, before the corporation has become insolvent. The attitude of the preferred shareholder on these conditions is that of creditor. He invests his money, is assured a fixed rate of interest, and may enforce repayment of the money, with interest, on specified notice. The only possible gain is the rate, definitely fixed. The only risk is possibility of a shareholder's liability in event of insolvency before he is repaid voluntarily or according to the terms of the amendment to the articles.

It was observed in *Warren v. King,* 108 U. S. 389 (27 L. Ed. 769), that "his [shareholder's] chance of gain by the operations of the corporation throws on ·him, as respects creditors, the entire risk of the loss of his share of the capital, which must go to satisfy the creditors in case of misfortune. He cannot be both creditor and debtor by virtue of his ownership of stock." In *Hamlin v. Toledo, St. L. & K. C. R. Co.,* 36 L. R. A. 826, the late Justice Lurton, speaking for the United States Circuit Court of Appeals, declared that:

"There is a wide difference between the relation of a creditor and a stockholder to the corporate property. One cannot well be a creditor, as respects creditors proper, and a stockholder by virtue of a certificate evidencing his contribution to the capital of the corporation. Stock is capital, and a stock certificate but evidences that the holder has ventured his means as a part of the capital. It is a fixed characteristic of capital stock that no part of it can be withdrawn for the purpose of repaying the principal of the capital stock until the debts of the corporation are paid. These principles are elementary. *Warren v. King,* 108 U. S. 389 (27 L. Ed. 769) ; Cook, Stock & Stockholders (3d Ed.) 271. The chance of gain throws on the stockholder, as respects creditors, the entire risk of the loss of his contribution to capital. 'He cannot be both creditor and debtor by virtue of his ownership of stock.' *Warren v. King,* 108 U. S. 389 (27 L. Ed. 769). If the purpose in providing for these peculiar shares was to arrange matters so that, under any circumstances, a part of the principal of the stock might be withdrawn before the full discharge of all corporate debts, the device would be contrary to the nature of capital stock, opposed to public policy, and void as to creditors affected thereby. Cook, Stock & Stockholders (2d Ed.) 270, 271; *Chaffee v. Rutland R. Co.,* 55 Vt. 110; *McCutcheon v. Merz Capsule Co.,* 37 U. S. App. 586 (31 L. R. A. 415, 19 C. C. A. 108–115, 71 Fed. 787) ; *Morrow v. Nashville Iron, Steel & C. Co.,* 87 Tenn. 262 (3 L. R. A. 37)."

In *Burt v. Rattle,* 31 Ohio St. 116, a certificate for 50 shares of so-called preferred stock in a corporation convertible into common stock at the option of the holder was issued to Rattle. It guaranteed to the holder the payment of semiannual dividends at the rate of 4%, and "the final payment of the entire amount of said shares, at their par value, on the 1st day of January, 1876, at which time such dividends shall cease." Payment of interest and par value was secured by bond and mortgage, and after an assignment of the property of the company for the benefit of creditors. The assignee refused to recognize this or other like certificates, and thereupon, the holder instituted foreclosure proceedings. The assignee set up, by way of defense, that the holder of the certificate was a mere shareholder, and that the company was without authority to execute the bond and mortgage. On hearing, the court held that the certificates of so-called stock, issued by the corporation, "cannot be regarded, in any view, as anything more than promises to pay money with interest." This was affirmed on appeal, the court declaring the transaction "a loaning of money," and "not the creation of additional members of the corporation." In the course of the opinion, it is said that the so-called preferred shareholders "have no right to vote, or to take any part in the possession or control of the concern. They gain nothing by its success, and lose nothing by its failure. They have no participation in either the profits or losses. They are strangers to the company, have no interest in it, and look alone to its promise and its mortgage for remuneration."

In that case, the preferred shareholder was relieved from liability to creditors, as shareholder, and this was made one ground for the decision. See also *West Chester & P. R. Co. v. Jackson,* 77 Pa. St. 321; *Williams v. Parker,* 136 Mass. 204; *National Salt Co. v. Ingraham,* 122 Fed. 40.

The so-called certificates of preferred stock have all the characteristics of evidences of indebtedness and none of those of stock certificates, and we are of opinion that they are absolutely void as *stock certificates.*

III. Appellant insists that the point last considered was not raised in the pleadings. The petition alleged that the 30 shares of preferred stock obtained from plaintiff were void, for that Sections 1641-b, 1641-c, 1641-d, and 1627 of the Code Supplement, 1913, were not observed; and further, that the pretended certificate was, in part, for shares in excess of the number authorized. There was also a general denial. Necessarily involved was the issue whether a certificate of shares of capital stock was issued at all, and that is the precise issue decided against appellant. The point presented was raised.

2. PLEADING: issue, proof, and variance: issuance of corporate stock.

IV. The amendment to the articles limited the number of shares to 25% of those of common stock. There were then outstanding, when the certificate of 30 shares was transferred by defendant to plaintiff, 26 shares of preferred stock and 171 shares of common stock. It follows that the certificate so transferred was for 13¼ shares more than was authorized.

To the extent of $1,675 at least, plus unpaid dividends, the certificate represented an indebtedness against the corporation. Though evidences of indebtedness in this form were limited, it does not appear that any limitation of indebtedness differently evidenced was contained in the articles; and, as the corporation received the full amount of money represented by the certificate and made use of in its business, it would not seem that it would be in a situation to invoke the doctrine of *ultra vires*. *Beach v. Wakefield*, 107 Iowa 567. At any rate, plaintiff was well aware that suit was pending for the par value of this certificate, with unpaid dividends; and, as the consideration paid by him was in settlement of that action, as well as for the assignment of the certificate, he necessarily, in the absence of fraud, took his chances on whether the certificate was valid for the entire amount, or only $1,675, with unpaid interest.

What we have said disposes of other contentions, and

the decree dismissing the petition is—*Affirmed.*

PRESTON, C. J., EVANS and SALINGER, JJ., concur.