JOHN A. FLEMING, Appellant, v. SIMON CASADY, Executor, et al., Appellees.

TRUSTS: Express Trusts—Trust Rendered Dry By Conveyance.  A
1    testamentary, non-spendthrift trust in real estate and in the income thereof, which imposes no limitation or prohibition on the right of the beneficiaries to convey, is rendered passive by the conveyance by all the beneficiaries of their respective interests; and this is true where the beneficiaries have the right, under the will, to compel the trustee, on petition to him, to sell the subject-matter of the trust and to divide the proceeds among themselves.

    ALBERT, J., dissents.

TRUSTS: Express Trusts—Dry Trust—Duty of Trustee.  A trustee who
2    holds the naked legal title to property under a trust which has become legally dry should convey to the beneficial owners.

TRUSTS: Express Trusts—Management—Defending Dry Trust.  A
3    trustee may not employ attorneys at the expense of the estate to defend a trust which has become legally dry.

LANDLORD AND TENANT: Termination—Merger—Acquisition of
4    Title By Stockholder of Corporate Lessee.  A lease in which a corporation with many stockholders is lessee may not be said to be merged, and thereby terminated, simply because *some* of the stockholders acquire the equitable title to the real estate.

TENANCY IN COMMON: Mutual Rights—Purchase of Outstanding
5    Lease, Etc.  One of several tenants in common of the fee to land who, on his own behalf, purchases of a lessee both an outstanding long-time lease on the said land and the building thereon, erected and owned by the lessee under said lease, may not enforce contribution from his cotenants for his outlay; *nor may said cotenants legally demand the right to make contribution to the purchasing tenant and become tenants in common of the building.*

TRUSTS: Construction—Joint Purchase of Property.  When the *benefi-*
6    *ciaries* of a trust in real property and in the long-time lease thereon are given the right either to continue to receive the rent under the lease, or to terminate the lease by *jointly* purchasing of the lessee the building which the lessee has erected on the land, under the lease, then the *assignees* of the beneficiaries must likewise act *jointly* in the purchase of the building.

    Headnote 1:  39 Cyc. p. 225.  Headnote 2:  39 Cyc. p. 225.  Headnote 3: 39 Cyc. p. 340.  Headnote 4:  35 C. J. p. 1057 (Anno.)  Headnote 5:  38 Cyc. p. 46.  Headnote 6:  38 Cyc. p. 105; 39 Cyc. p. 237.

    Headnote 1:  26 R. C. L. 1211.

*Appeal from Polk District Court.*—LESTER L. THOMPSON, Judge.

DECEMBER 16, 1926.

Suit to adjudge a trust terminated, to establish an undivided interest in improvements, and for re-appraisement under long-time lease.   Decree for defendants.   Plaintiff appeals.—*Affirmed in part; reversed in part.*

*William E. Miller* and *Jesse A. Miller,* for appellant.

*Henry & Henry, Carr, Cox, Evans & Riley,* and *Fred P. Carr,* for appellees.

MORLING, J.—The property in controversy is the quarter block at the southwest corner of Seventh and Walnut Streets in the city of Des Moines, known as the Masonic Temple block, and

1. TRUSTS: express trusts: trust rendered dry by conveyance.

described as Lots 7 and 8 in Block 2.   The ground was leased by William McClelland to the Masonic Temple Association for 20 years from September 1, 1883.   Under this lease, the Masonic Temple Association in 1883 erected on the leased ground a building, which, with additions, is still standing.   On October 14, 1902, a new lease for the term of 50 years, commencing on the first day of September, 1903, was entered into, by which the association agreed to pay yearly for the first 10 years $4,000, besides taxes and special assessments.   The lease further provided:

"At the commencement of the second 10 years of this lease, and at the commencement of each 10 years thereafter, the ground, exclusive of the buildings or improvements, is to be appraised by disinterested appraisers, who shall be citizens and owners of real estate in the city of Des Moines.   The appraisement to be under oath and signed by the parties   *   *   *   The appraisers shall be selected, one by the said party of the first part, and one by the party of the second part, and if the two thus selected cannot agree   *   *   *   the said two appraisers to select a third appraiser, and as rent for the second term of 10 years   *   *   *   (provided a purchase by either of the parties hereto shall not be made as hereinafter provided) the said party

of the second part shall pay annually an amount equal to four (4) per cent of the value of said ground as fixed by said appraisers   *   *   *   and also shall pay all taxes and special assessments   *   *   *   At the expiration of the second 10 years herein provided for, and at the expiration of each 10-year period thereafter during the continuance of this lease in case the said McClelland shall not then be living the buildings and improvements heretofore or hereafter made or erected by the said party of the second part and then remaining on said ground shall be also appraised by the disinterested appraisers heretofore provided for, and the heirs or assigns of the party of the first part are to have the right to purchase said buildings and improvements at such appraisements, provided they shall so elect within 90 days after the expiration of said term of 20 years, and in case the said heirs or assigns shall not elect to purchase said buildings and improvements at such appraised price, then the said party of the second part shall have the right to purchase the said ground at and for the price fixed by said appraisers as the value thereof exclusive of the buildings and improvements provided it so elects to do within 90 days after the expiration of the said time when said heirs or assigns of the said first party have the right to purchase the said buildings and improvements, and if the said McClelland shall be then living at the expiration of said 20 years from the commencement of this lease, then the Masonic Temple Association party of the second part shall have the right to purchase said ground at the expiration of any of the periods of 10 years when the same shall be appraised as hereinbefore provided for after the death of the said McClelland.

"The heirs or assigns of said McClelland to have the right first to purchase the buildings and improvements. It being understood that during the lifetime of said McClelland, the said party of the second part does not have the right to purchase said ground. In case the said heirs or assigns of the said McClelland shall not elect to purchase said buildings and improvements at such appraised price and the said party of the second part does not elect to purchase said ground in accordance with the stipulations hereinbefore made, then the said party of the second part shall pay as rent for the said ground for the period of 10 years thereafter the sum of four (4) per cent of the appraised value of said ground annually and all taxes, and assessments,

the rent to be quarterly in advance as hereinbefore stated, and at the end of each 10 years the same appraisement is to be made in the same manner, and each party to have the rights and options as above hereinbefore provided for until said buildings and improvements are purchased by the heirs or assigns of said McClelland or said ground shall be purchased by said party of the second part.

"At the expiration of the term of 50 years first herein mentioned, if the heirs or assigns of said McClelland should not elect to purchase the buildings and improvements as hereinbefore provided, then the said party of the second part shall have the right of purchase of the ground as hereinbefore provided, and in case the said party of the second part does not elect to purchase said ground in accordance with the stipulations hereinbefore made, then this lease shall be extended for another term of 10 years from that date and the said party of the second part shall pay as rent therefor the sum of four (4) per cent of the appraised value of said ground annually, and all taxes and assessments, the rent to be paid quarterly in advance as hereinbefore stated, and at the end of each 10 years, the same appraisement to be made in the same manner and each party to have the right and options as above and hereinbefore provided for, until said buildings and improvements are purchased by said heirs or assigns of said McClelland, or said ground shall be purchased by the said party of the second part. * * * "

The lease provided for re-entry on six months' default, and that it should take the place of the first lease. The lease, together with all of the interest of the Masonic Temple Association in the buildings and improvements, was assigned by the association on November 2, 1908, to the defendant Young Realty Company, which assumed the payment of the rent from December 1, 1908.

The trust in question was created by the will of William McClelland. He died December 4, 1907, unmarried, leaving a will dated May 4, 1897. This will appointed the defendant Simon Casady as executor, and directed that the lots in question, "and other real property that I may own at my death then under lease, and the rents arising therefrom after payment of all taxes and assessments thereon and any debts that I may owe at my death, shall, at my death, be held by my executor hereinafter

named, in trust for the following persons in common; that is to say:

"For my brother, Nathaniel McClelland, one-third (1/3) interest therein.

"For my brother, Charles McClelland, one-third (1/3) interest therein, and

"For my brother, Henry McClelland, one-third (1/3) interest therein, and

"Whereas, Lots seven (7) and eight (8), in Block two (2) aforesaid are now under lease to the Masonic Building Association and said lease may be further extended or modified during my lifetime.

"Now, therefore, my executor shall retain title to said lots and any other property owned by me under lease at my death, in trust, as aforesaid, and collect and pay over the net income thereof semiannually to the persons, above named in this clause of this will, one-third part to each until said lease shall be terminated, unless the legatees herein named (or in case of their death or of the death of either of them, then their heirs) shall each and all freely and mutually petition the executor named in this will or his successor to sell said property subject to the lease. In case they shall so petition and desire the sale of said property subject to the lease thereon, then my executor shall sell said premises subject to said lease and distribute the net proceeds thereof as above directed, to wit: one-third (1/3) part to my brother Henry McClelland, and one-third (1/3) part to my brother Nathaniel McClelland, and one-third part (1/3) to my brother Charles McClelland. In case no sale shall be made of said premises as above indicated during the existence of the leases thereon, then at the termination of said lease or leases, said premises shall be sold by my executor for the best price obtainable, and the net proceeds arising therefrom shall be paid over to the above named parties in the proportions specified. If either of the above named beneficiaries should not survive me, then I will and direct that his lawful heir or heirs shall take his share, as the case may be, in the same manner as if named in this will."

Charles McClelland predeceased the testator, leaving nine children, of whom eight, in the years 1908 to 1910, conveyed their respective undivided one-twenty-seventh (1/27th) interests in the lots to defendant Lafayette Young, Sr. The deeds ex-

pressed that they were subject to the lease referred to, and conveyed the grantors' interest in the lease, and were also in terms subject to the probate proceedings, claims, and costs in the William McClelland estate.

The other two brothers died after the testator, leaving a number of children and grandchildren. In 1917 and 1922, interests derived through these brothers were conveyed to L. Young, Sr., under similar deeds, and one interest was contracted to L. Young, Jr. By means of these, L. Young, Sr., and L. Young, Jr., acquired 482/1,080ths. On July 27, 1923, all of the remaining beneficial interests, including the interest of the vendor in the contract with L. Young, Jr., were conveyed to plaintiff. Plaintiff and the defendants L. Young, Sr., and L. Young, Jr., are now the owners of the entire beneficial interests in the ground and landlord's rights under the lease. On July 30, 1923, plaintiff notified Mr. Casady that he had acquired the 598/1,080ths from the McClelland heirs, naming them, and that L. Young, Sr., and L. Young, Jr., had acquired the 482/1,080ths interest; that the conveyance to the Youngs and to him terminated the trust. Plaintiff demanded a conveyance of the 598/1,080ths interest, and stated that Mr. Casady's participation in the selection of appraisers, so far as concerned plaintiff, was terminated. An executor's deed was tendered for execution. Afterward, Mr. Casady and L. Young, Jr., representing all the Young interests, had conferences, in one of which the Youngs' attorney delivered to Casady his opinion to the effect that the trust was to run for the period of the lease, unless sooner terminated by the court, and that until then it was the duty of the trustee to name the appraiser for the lessor. Mr. Casady named to L. Young, Jr., a number of possible appraisers, to whom Mr. Young made no objection. On August 5, 1923, Mr. Casady, without any consultation with plaintiff, and without plaintiff's knowledge, appointed George B. Hippee to act as appraiser for Casady as trustee. The Youngs nominated McCutchen as appraiser for the lessee.

On August 7, 1923, Casady notified plaintiff and the Youngs that he had designated Hippee as appraiser, to act with McCutchen, and that they had appraised the lots at $625,000 and the buildings at $150,000. Plaintiff at once repudiated the appraisement, so notifying Casady and the Youngs.

I. Plaintiff's contention is that, by the conveyances of all

of the beneficial interests in the trust to him and to the Youngs, the trust ceased to be active, and that Mr. Casady thereupon held only the naked legal title, in dry trust, and should be compelled to convey to the equitable owners. The trust is testamentary. The court should, from the will and its attendant circumstances, endeavor to ascertain the intention of the testator, and so far as practicable, without violating the terms of the instrument, carry the intention into effect.

The testator had neither wife nor descendants. His prospective heirs were three brothers, with families of considerable size. The property was one both valuable and growing in value, and incapable of division in kind. The buildings did not belong to him. The property at the date of the will was under a 20-year lease, containing provisions for appraisements and extensions, and provisions having particular reference to the rights of the testator's heirs at the expiration of the 20 years if he should not then be living. The terms of the lease and the will and the circumstances were such that new arrangements between the parties to the lease were undoubtedly in the contemplation of the testator. The new lease was made some five years after the will was executed, and it likewise contained special provisions applicable to testator's heirs. The testator made no change in his will after executing the new lease. Under either lease, one of the important questions that would confront the beneficiaries would be whether the income from the property and its prospective rise in value would be more advantageous than the proceeds on its sale. There was at least a possibility that there would be differences of opinion among so many owners, on this question as well as on the appointment of appraiser. Some of the beneficial interests might fall to minors. There is nothing to indicate that the testator had in mind the interests of anyone but his brothers, and their families, in case of their death. There is nothing to suggest any solicitude for the interests of the lessees or their assignees. No reason is suggested why he should construct a trust for them. The will contains no prohibition or limitation on the right of the beneficiaries to sell their interests. Hence they had the right to assign. *Merchants' L. & Tr. Co. v. Patterson*, 308 Ill. 519 (139 N. E. 912) ; *Boston Safe Deposit & Tr. Co. v. Luke*, 220 Mass. 484 (108 N. E. 64).

"In the consideration of a court of equity, the *cestui que*

*trust* is actually seized of the freehold. He may alien it, and any legal conveyance by him will have the same operation in equity upon the trust as it would have had at law upon the legal estate * * * Generally, whatever is true at law of the legal estate is true in equity of the trust estate.'' *Croxall v. Shererd,* 5 Wall. (U. S.) 268, 281.

The trust created was not a spendthrift trust. *Hall's Estate,* 248 Pa. St. 218 (93 Atl. 944); *Houghton v. Tiffany,* 116 Md. 655 (82 Atl. 831); *Winslow v. Rutherford,* 59 Ore. 124 (114 Pac. 930). It is not claimed that the equitable interests did not vest from the date of testator's death. The will expressly gives to the brothers, or, in case of their death, to their heirs, the right to have the property sold and the proceeds distributed. If the formula provided by the will to this end had been followed, it would not be questioned that the trust was at an end. We think that the purpose of the testator was to enable any one of the ''legatees or in the case of their death * * * their heirs'' to retain the right to his portion of the income against the desire of others to sell the corpus. The will reads, ''in case they shall so petition and desire the sale,'' then the executor shall sell.

It will be noted that the right or option to petition is to ''the legatees herein named'' (or, in case of their death, or of the death of either of them, then to their heirs). Assignees are not named, nor is the lessee noticed. The question of the right of assignees to refuse to petition while any of the designated beneficiaries retain their interest, is not before us. The substance of the provision is the desire of all of the legatees, or their heirs, to sell. It is conceded, as will be seen, that, when all of the beneficiaries had assigned, all the assignees might by petition have the trust terminated. As to the legatees and their heirs, the substance is the desire of all to sell. The trustee was an agent representing all the beneficiaries. It became the trustee's duty to sell and to wind up the trust when all the beneficiaries desired it. In substance, the trust would end when the beneficiaries all desired to sell and a sale was made and the proceeds distributed. There is no reason why the beneficiaries cannot do voluntarily and personally that which they are empowered to compel to be done through the trustee. The desire and the end, and not the method of expressing the desire, are of the substance. The separate conveyances by all the beneficiaries should be given the

same effect in equity as a conveyance by the trustee made upon their request. 2 Perry on Trusts, Section 784; *Walke v. Moore,* 95 Va. 729 (30 S. E. 374); *Bank of Berkeley Springs v. Green,* 45 W. Va. 168 (31 S. E. 260); *Tucker v. Tucker,* 308 Ill. 371 (139 N. E. 609). The purposes of the trust have been accomplished. The entire beneficial interest is vested in the plaintiff

2. TRUSTS: express trusts: dry trust: duty of trustee.

and L. Young, Sr., and L. Young, Jr. They are *sui juris.* There is nothing in the will which gives to the defendants any right to continue the trust, and no provision that will be frustrated by its termination. The beneficiaries have sold the property and received the proceeds. The trust should be terminated and the trustee decreed to make conveyance to the owners of the equitable estate according to their interests. *In re Estate of Cornils,* 167 Iowa 196; *Karolussen v. Christianson,* 187 Iowa 744, and cases cited; *Olsen v. Youngerman,* 136 Iowa 404; *Brooks v. Davis,* 82 N. J. Eq. 118 (88 Atl. 178); *Simmons v. Northwestern Tr. Co.,* 136 Minn. 357 (162 N. W. 450); *Sears v. Choate,* 146 Mass. 395 (15 N. E. 786).

II. The trustee is resisting suit for termination of the trust. The petition sets up the conveyances to plaintiff and to the defendants Young, and the trustee's answer denies knowl-

3. TRUSTS: express trusts: management: defending dry trust.

edge or information of these allegations sufficient to form a belief. In substance, the trustee unites with some of the equitable owners or beneficiaries in defending against the claims of the others. The district court allowed the trustee $2,000, "as compensation for counsel employed to defend this action," and directed him to withhold that sum from funds coming into his hands by virtue of the trust. The trustee does not claim that anyone is beneficially interested in the trust, other than the parties to the action, or that any of them are laboring under any disability. L. Young, Jr., testifies that Mr. Casady "asked my advice about having legal opinion, and I told him I would be very glad to get him one." It was after this that Mr. Young and his attorney called on Mr. Casady and gave him the opinion previously referred to. He also testifies that he regarded Mr. Hippee as the appraiser chosen on behalf of the beneficial owners, and their representative and advocate, and Mr. McCutchen as the representative and advocate of the Young Realty Company. In 1909,

with the authority of his father, L. Young, Jr., wrote to two attorneys, asking them whether his father's holdings would "give the lease a perpetual character unless he joins with the other heirs in buying out his own building. Our argument is based upon this presumption, that the heirs and assigns, to terminate the lease, must be unanimous. * * * We are of the opinion that, with Mr. Young holding undivided interests in the real property, as he does, he can practically make a perpetual lease * * * that he will always have a share in the appraisals. * * *"

What the opinions were, does not appear, but, at that time, only part of the beneficiaries had conveyed. Mr. Young, as assignee of some, had rights under the will and lease equivalent with those who had not assigned. The trust was still active. Mr. Casady testifies to having been informed of the substance of the opinions by L. Young, Jr., "quite a number of years" before the trial. Mr. McCutchen testifies to "Mr. Young's saying something to me about them being interested on both sides of the deal, and being able to a certain extent to govern the selection of the appraisers on both sides." This was before McCutchen was appointed appraiser. In negotiations between plaintiff and the Youngs, the Youngs expressed their adherence to the appraisement, and that the trust should continue in force, and they were not asking for its termination. In the trustee's argument it is said:

"It is perfectly true that the will of William McClelland does not purport to create the trust for any grantee of any heir or beneficiary, and that it does not express or imply any restraint against the alienation by the beneficiaries. Because of these facts, the plaintiff contends that the conveyances by the beneficiaries to the plaintiff and the defendants Young terminated the trust."

Also:

"The trustee [testator?] could not prevent the sale of any particular interest, but he could prevent the sale of the property by creating the trust, and this is exactly what he did. The heirs did not sell the legal title. They only sold their beneficial interest. When the trustee sells the legal title and distributes the proceeds between the plaintiff and the defendants Young, this will terminate the trust; and the beneficiaries will derive

the profits from the sale to repay them for their investment in purchasing the interests of the McClelland heirs. There is nothing to prevent them doing this at any time. Assuming that the property is sold now upon the mutual consent of the plaintiff and the defendants Young, for the appraised value of $625,000, this will terminate the trust, and the plaintiff and the defendants Young will each derive a considerable profit from their investment. Unless they can agree on a sale, the trust will continue until the termination of the lease by lapse of time or otherwise.''

Mr. Casady stands here, therefore, admitting that the other parties to the action (Fleming, L. Young, Sr., and L. Young, Jr.) are now the only ones interested in the trust, and that their united consent to a sale by him, and the sale and distribution of the proceeds among them, would terminate the trust. No collusion to wrongfully terminate the trust is suggested. On this record, he had no standing to dispute the plaintiff's application. *Eakle v. Igram,* 142 Cal. 15 (75 Pac. 566); *Sears v. Choate,* 146 Mass. 395 (15 N. E. 786); *Slater v. Hurlbut,* 146 Mass. 308 (15 N. E. 790); *Coram v. Davis,* 39 Mont. 495 (104 Pac. 518).

A trustee has no authority to employ counsel at the expense of the estate to represent the interest of one beneficiary, in hostility to that of another. To permit him to do so would be to allow the trustee to pay from the property of one litigant the counsel fees of his opponent. *Stull v. Harvey,* 112 Va. 816 (72 S. E. 701); *Taylor v. Denny,* 118 Md. 124 (84 Atl. 369). The trustee has not pleaded, nor has he offered any evidence, that the beneficiaries are indebted to him, though he does testify that he has received no compensation for his services since he ceased to act as executor. He does not show what services he rendered or what they were worth. He testifies that he thought the estate had been closed in 1913.

''I assumed I had been discharged long ago * * * As far as I am concerned, thought the estate had been closed for many years.''

On July 18, 1923, he made a report that there was no money in his hands as executor, and asked for an order for his discharge, but continuing him as trustee. He says that this application was brought to him by Mr. Henry, ''to make the

title right." He had heard that negotiations for the sale
of the McClelland interests were going on. On July 18, 1923,
an order discharging him as executor and continuing him as
trustee of the lots was entered. On this record, claim for
compensation for his counsel should be denied.

III. Plaintiff claims that he is entitled to make contribu-
tion toward the value of the buildings in proportion to his
interest in the ground, and on offering that, has the rights of a
4. LANDLORD AND  tenant in common in the buildings, as well as
TENANT: termi-
nation: merger:  in the ground. He claims that the lease is
acquisition of
title by stock-  merged. His proposition in support of this
holder of cor-
porate lessee.   claim is that the individual Youngs and the
Young Realty Company are, in substance and identity, the
same; that the realty company is merely a form of organiza-
tion under which the individual Youngs are doing business,
and which should be disregarded; that, when the lease was
assigned to the Young Realty Company, Young was already a
cotenant in the reversion; that, therefore, the Youngs indi-
vidually should be held to be, in substance, the owners not only
of their undivided interest in the land, but of the lease and
buildings. On these premises, plaintiff argues that he, as a
tenant in common, is entitled to the advantage of their acqui-
sition of the lease, to the extent of his proportionate share.

L. Young, Sr., in Cavanaugh's name, acquired the interest
of one of the McClellands on October 14, 1908. On October 29,
1908, the Young Realty Company was organized. On November
2, 1908, the lease was assigned by the original lessee to the
Young Realty Company.

We may assume that the corporation was organized for
the purpose of taking over and holding the lease. The incor-
porators were L. Young, Sr., Harold Young, and L. Young, Jr.
One half of the stock is common, and was issued originally to
L. Young, Sr. Five shares were transferred to Harold Young,
and five to L. Young, Jr. The evidence is that the company
"now has and always has had $45,000 authorized common stock
and $45,000 authorized preferred stock."

"Q. How much stock do you [L. Young, Sr.,] hold in
the Young Realty Company, and how was it paid for, and
when? A. 440 shares of common stock; 82 shares of preferred
stock. All of this stock was purchased by me for cash, at the

time of the founding of the corporation. Preferred stock has been increased and reduced, from time to time, as holders have wished to make purchases and sales.''

No dates of transfers are given. The articles of incorporation provide that the holders of the common stock may vote, and the holders of the preferred stock may not vote, so long as the corporation is not in default in dividends, except that they may vote on the question of mortgaging the property. The preference given is the usual one. More than 300 shares of the preferred stock are in the names of others than the defendants Young.

The holders of the preferred stock are co-owners, and not creditors of the corporation. Their status as existing stockholders is not destroyed because their stock may be retired or because they have no voting power. 14 Corpus Juris 417, 418; *Wright v. Johnston*, 183 Iowa 807; *Spencer v. Smith*, 120 C. C. A. 75 (201 Fed. 647); *Kinston Cotton Mills v. Wachovia Bank & Tr. Co.*, 185 N. C. 7 (115 S. E. 883, 29 A. L. R. 251). In *Fleming v. Fleming*, 194 Iowa 71, the associates, whether they were partners or a corporation, were identically the same persons. In *Keokuk Elec. R. & P. Co. v. Weisman*, 146 Iowa 679, 687, the individual was the owner of the company and the beneficial owner of the property. In these and similar cases cited by plaintiff, the legal fiction of separate corporate organization was disregarded. In this case, the separate corporate organization, when it acquired the lease, is not shown to have been a fiction, or to have been identical in ownership and interest with L. Young, Sr., and L. Young, Jr. Presumptively, the corporation is a distinct entity.

Nor do we think that the purchase of the lease and the buildings, if it had been made by L. Young, Sr., individually, while he was a tenant in common with the McClelland heirs, would entitle the plaintiff, on offering contribution, to share in the benefits of it. We pass the questions whether plaintiff succeeded to the rights of his grantors in this connection, or whether they or plaintiff waived any rights that they might have had, or whether the plaintiff has elected an inconsistent remedy. There was no duty resting on any of the cotenants to procure a discharge or termination of the lease. Neither of

5. TENANCY IN COMMON: mutual rights: purchase of outstanding lease, etc.

them had any right to cancel the lease and the duty to pay rent, without the consent of the others. One of them acquiring the lease without the authority of the others could not claim contribution for his outlay. The interest of the cotenants was in the performance of the covenants of the lease. It would be no breach of duty for one of them to take an assignment of the lease and perform its covenants, which he would have to do to maintain his rights under it. The estate for years was not, in respect to the question here, hostile to the fee. It was carved out of the fee, for the benefit of the fee owners, as well as for the benefit of the lessee. The disability of a cotenant in respect to his dealing with the common property is based on the community of interest and common title which creates such a relationship of trust and confidence as would make it inequitable for one to do anything to the prejudice of the other in reference to the property. *Rothwell v. Dewees*, 2 Black (U. S.) 613; *Venable v. Beauchamp*, 3 Dana (Ky.) 321 (28 Am. Dec. 74); *Hoyt v. Lightbody*, 98 Minn. 189 (108 N. W. 843). In the *Venable* case it is said:

"This principle arises from the privity subsisting between parties having a common possession of the same land, and a common interest in the safety of the possession of each; and it only inculcates that good faith which seems appropriate to their relative position."

Here, the estate for years of the lessee and the fee in the lessors were distinct, separately owned, and held under contract between them. The acquisition of the lease by one co-owner of the reversion could not operate to oust, threaten, or undermine the estate of the other co-owners. No advantage by breach of trust or confidence would result from the purchase of the lease by one of them. See, further, *Weare v. Van Meter*, 42 Iowa 128; *Van Horne v. Fonda*, 5 Johns. Ch. 389; *Mitchell v. Reed*, 61 N. Y. 123; *Cooper v. Edwards*, 152 La. 23 (92 So. 721). There was no express intention of merging the term for years or any part of it in the equitable fee. We think no such intention can, under the facts of this case, be implied. *Sweet v. Henry*, 175 N. Y. 268 (67 N. E. 574); 2 Pomeroy's Equity Jurisprudence (4th Ed.), Section 788. We are of the opinion that the plaintiff is not entitled to make contribution

and claim co-ownership in the buildings, and that there is no merger of the lease.

The rights of the holder of the leasehold and the owners of the reversion, as between themselves, remain to be considered. Plaintiff and defendants L. Young, Sr., and L. Young, Jr., hold in common a lessor's rights under the lease. One of these rights is to purchase the buildings within 90 days after the expiration of the 20-year period. It is the fault of the defendants, and not of the plaintiff, that a lawful appraisement was not made, and, as will be seen, a proper appraisement was not made, by the court below. The 90 days, therefore, will date from the entry of final decree pursuant to this opinion. The option given by the lease is not to purchase an undivided interest in the buildings and improvements. Hence, the realty company is not required to convey to plaintiff a proportionate interest. If it be conceded, without being decided, that, if the option were merely to purchase the building, and that, as between the owners in common, one of them might have the right of exercising the option if the others did not elect to join with him and would not be prejudiced, still more is involved here than merely the exercise of an option to purchase the building. Such purchase would operate to terminate the lease and the duty of the lessee to pay rent. One of the owners of the ground might prefer to purchase the building and terminate the lease, and another might prefer to continue the lease and receive the income provided by it. The exercise of the option is an affirmative act, and in the absence of its exercise, the lease continues in effect. We think that one cotenant has not the right to determine that affirmative act without the consent of the others, and thereby terminate the lease and renounce all right to its continuance and the continued duty of the tenant to pay rent. No claim for a partition is made. If the owners of the ground do not exercise the option given them, then the realty company will have, after the expiration of that right, the 90 days provided for by the lease to purchase the ground. The rent will be computed and paid from September 1, 1923, on the valuation fixed in this opinion until the termination of the lease under the options, if exercised, and if not exercised, then until the next appraisement. The decree will be without prejudice to

6. TRUSTS: construction: joint purchase of property.

the right of either co-owner to institute an action for partition.

IV. The valuations of the trial court are before us for review. It should be stated that no misconduct in the appraisement, or actual bias, appears. The evidence is voluminous, and to set it out or to attempt to summarize it would serve no useful purpose. We are of the opinion that the valuation of the ground should be fixed at $700,000, and of the building at $150,000.

Suggestion of the death of Lafayette Young, Sr., has been made, and the administrator or executor of his estate will be substituted.

One half of the costs in this court will be taxed to the plaintiff, and one half to the defendants Young Realty Company, Lafayette Young, Jr., and the administrator or executor of the estate of Lafayette Young, Sr.

The decree is in part affirmed, and in part reversed.—*Affirmed in part; reversed in part.*

DE GRAFF, C. J., and FAVILLE and VERMILION, JJ., concur.

STEVENS, J., concurs in the result, with the reservation that, in his opinion, the aggregate value of the property as fixed by the majority is excessive.

ALBERT, J., concurs with STEVENS, J., on the question of valuation, and dissents to the holding of the opinion on the question of a dry trust.

EVANS, J., not participating.