ARTHUR R. JONES SYNDICATE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 8343. Promulgated December 17, 1926.

Amounts paid by petitioner during the taxable year for the use of money for which first preferred shares were issued represented the payment of a dividend and not the payment of interest on indebtedness.

*Maurice T. Weinshenk, Esq.*, and *David K. Tone, Esq.*, for the petitioner.

*A. H. Fast, Esq.*, for the respondent.

In this proceeding the petitioner contests the determination of a deficiency in income and profits tax for 1921 in the amount of $4,005.73, resulting from the disallowance of a deduction of $29,166.65, claimed by the petitioner to have been paid as interest on a loan. The Commissioner designated the amount as a dividend upon stock.

FINDINGS OF FACT.

The petitioner is an Illinois syndicate with its office at 842 First National Bank Building, Chicago. The Arthur R. Jones Syndicate was organized in December, 1920, for the purpose of purchasing and acquiring title to certain real estate, the "Springer Building," located at Clinton and Canal Streets, in the City of Chicago, and to manage and dispose of the same for the benefit of its members. The property was acquired by the Syndicate at a master-in-chancery sale, through the agency of the Northern Trust Co. of Chicago. The legal title to the property was placed in the Chicago Title & Trust Co. as trustee for the members of the Syndicate.

Arthur R. Jones held a fourth mortgage on the property in the amount of $65,000 and was required to make redemption on or before December 11, 1920, in order to protect his interest. Approximately $600,000 was needed for this purpose. He and some of his associates valued the property considerably in excess of the amount required to redeem the same, and they raised among themselves $350,000, with the understanding that a Syndicate would be organized and that certificates or shares would be issued to the contributors in proportion to the amount contributed, the understanding being that preferred shares would be issued for the amounts contributed and that $65,000 common shares would be issued to Jones for his claim against the property. These men were unable to obtain additional contributions to bring the amount to $600,000.

Among the subscribers who had agreed to contribute to the enterprise were F. C. Austin, who had subscribed $50,000, and his cousin, H. W. Austin, who had subscribed $50,000. F. C. Austin was a wealthy man. Before any syndicate agreement had been drawn and on or before November 1, 1920, Jones approached F. C. Austin for a loan to the Syndicate of $250,000. At first Austin was not favorable to making the loan. Jones had several talks with him about the matter, and finally Austin stated that he would make the loan but could not do so at the legal rate of interest, and agreed to loan the Syndicate $250,000 provided he was paid 14 per cent per annum thereon. Thereupon, Jones discussed the matter with his associates. At first they all objected to paying 14 per cent interest, but finally, when it was found that there was no other way that

they could raise the amount of money needed to take over the property, they consented to pay Austin 14 per cent interest per annum. Austin was informed of this fact, whereupon he stated to Jones that the loan would be for two years. Jones desired that the loan should be for one year, but Austin refused to make it on that basis and it was finally agreed that the loan would be made on December 11, 1920, and become due on July 1, 1922. On or about December 8, 1920, Austin demanded that, in addition to the interest at 14 per cent per annum, he be given $20,000 of the common shares which were to be issued to Jones for a claim against the property as a bonus for making the loan. Jones refused this demand and Austin informed him that in that event he would not loan the Syndicate the $250,000. Thereupon, Jones began negotiations with his friend Wm. Tilden, president of the Ft. Dearborn National Bank, with the view of seeing if other arrangements could be made to raise the money. After considerable discussion of the matter, Tilden informed Jones that if he could not borrow the money elsewhere he would loan him $250,000 if it should become necessary to protect Jones' interest in the property. It was not convenient for Tilden to make the loan, but he agreed to arrange it because of his personal friendship with Jones. It was the desire of Jones and his associates to obtain the loan elsewhere than from Tilden if possible. After his talk with Tilden, Jones again conferred with F. C. Austin and informed him of the negotiation with Tilden, whereupon Austin agreed to loan the Syndicate $250,000 at 14 per cent per annum and to waive his demand for the $20,000 common shares as a bonus. Up to this time nothing had been said by anyone concerning the matter of the issuance by the Syndicate of first preferred shares; on the contrary, the understanding was that preferred shares would be issued for the amounts contributed to the Syndicate, including the $50,000 contributed each by F. C. Austin and H. W. Austin, and that any profit upon such contributions should be entirely dependent upon the success of the Syndicate.

About the day before it was necessary to take over the property under the right of redemption, up to which time the loan of $250,000 had not been made, Austin informed Jones that it was his desire to have the loan of $250,000 evidenced by first preferred stock of the Syndicate and that his attorney would prepare and submit an agreement providing for this. The reason given by Austin for this was that, although he was convinced from his dealings with Jones over a long period of years, if it were a personal matter with Jones he would pay the 14 per cent per annum without question and carry the transaction out in good faith, but inasmuch as he was lending the money to the Syndicate composed of several people he feared the

usury law. Austin forthwith had prepared and submitted to the Syndicate an agreement, hereinafter set forth in the findings of fact. Jones and his associates met and discussed the agreement and the members were informed by Jones of his conversation with Austin. The time for action was at hand and the Syndicate members acceded to the demands of Austin. Austin was informed of the assent of the Syndicate members to the agreement, whereupon Austin made a last moment demand that the 14 per cent per annum on the $250,000 be paid monthly and that a guarantee policy guaranteeing the title to the property be executed in favor of F. C. Austin and H. W. Austin by the Chicago Title & Trust Co., as trustees, in the amount of $350,000 to protect not only the $250,000 advanced by Austin but also the $100,000 which he and his cousin, H. W. Austin, had subscribed in the amount of $50,000 each as second preferred shareholders of the Syndicate. The Syndicate agreed to make payments monthly, and the policy in favor of F. C. and H. W. Austin was procured, for which a premium of $1,500 was paid by the Syndicate.

On December 1, 1920, the following agreement drawn by the personal counsel of F. C. Austin was executed and adopted by the members of the Syndicate and assented to by the Chicago Title & Trust Co. as trustees. The $250,000 was thereupon advanced by F. C. Austin to the Syndicate. The receipt of this sum was evidenced by a document which recited that F. C. Austin was the owner of 2,500 shares of first preferred shares of the par value of $250,000 and that such shares were redeemable on July 1, 1922, at par plus a dividend at the rate of 14 per cent per annum.

This Agreement, made this first day of December, 1920, between

> F. C. Austin
> H. W. Austin
> David K. Tone
> Frank Schoenfeld
> J. Wallace Wakem
> William B. Frankenstein
> Arthur R. Jones and
> Irving Isador, parties of the first part
> and

Chicago Title & Trust Company, party of the second part, Witnesseth:

THAT WHEREAS first parties, for the purpose of investment, did heretofore determine to acquire the beneficial interest in the proceeds and avails of the following described property, to wit:

> \*       \*       \*       \*       \*       \*       \*

WHEREAS, first parties did not intend or desire to acquire any title to said property, legal or equitable, but only an interest in the net avails and proceeds thereof; and

WHEREAS, in pursuance of said plan of investment and concurrently and contemporaneously with the execution of this instrument, second party did acquire the title to the above described property for the benefit of first parties in the proportions and subject to the conditions hereinafter set forth; and

WHEREAS, first parties did heretofore agree and determine that the title to all of the said property should be acquired and held by second party upon the

trusts and for the uses and purposes and subject to all the terms and conditions hereinafter set forth;

Now, THEREFORE, in consideration of the premises and of the mutual agreements herein contained and of One Dollar ($1.00) to second party paid by first parties, the receipt whereof is hereby acknowledged, the parties hereto declare that the title to said property is held by second party in trust, upon the trusts and for the uses and purposes and subject to all the terms and conditions contained in this instrument, as follows:

## ARTICLE I.

The name of the association of the beneficiaries under this trust shall be ARTHUR R. JONES SYNDICATE, and its object shall be the acquisition of the above described property, the management and disposition of the real estate described in said master's certificate and the division of the profits, avails and proceeds of said trust property among its shareholders.

## ARTICLE II.

The following officers of the Syndicate are hereby named, to fill the respective offices, and to serve until their successors be duly elected and qualified:

| | |
|---|---|
| F. C. Austin | Chairman |
| J. Wallace Wakem and Arthur R. Jones | Vice-Chairman |
| H. W. Austin | Treasurer |
| William B. Frankenstein | Secretary |
| Frank Schoenfeld and David K. Tone | Counsel |

None of the above officers shall receive any compensation, except for services performed in behalf of the Syndicate, and in such case the amount thereof shall be determined by the Syndicate members.

Any one or all of said Syndicate officers may be removed at any time by the Syndicate members, and in case of the death, removal, resignation or incapacity of any Syndicate officer, then his successor shall be chosen by the Syndicate members, as provided in Article VII hereof.

## ARTICLE III.

The capital of the Syndicate shall be made up of twenty-five hundred (2500) first preferred shares of One Hundred Dollars ($100) each, six thousand (6000) second preferred shares of One Hundred Dollars ($100.00) each, and Six Hundred Fifty (650) common shares of One Hundred Dollars ($100.00) each, all of said preferred shares to represent and be issued only for cash paid in by preferred shareholders at par, and said common shares to represent and be issued to an amount of six hundred and fifty (650) shares of One Hundred Dollars ($100.00) each, to ARTHUR R. JONES in payment for his liens upon and interest in said real estate, which have been assigned to second party simultaneously with the execution and delivery hereof.

The following subscribers to preferred shares have paid the amounts set opposite their respective names.

FIRST PREFERRED.

F. C. Austin_____ $250, 000.

SECOND PREFERRED.

F. C. Austin_____ $_____
H. W. Austin_____ $_____
David K. Tone_____ $_____
Frank Schoenfeld_____ $_____
J. Wallace Wakem_____ $_____
William B. Frankenstein_____ $_____
Arthur R. Jones_____ $_____
Irving Isador_____ $_____

After the issuance of preferred shares to each of the subscribers as herein listed, and of common shares to the number of Six Hundred Fifty (650) shares of One Hundred Dollars ($100.00) each, to ARTHUR R. JONES, the remaining second preferred shares shall be issued only by vote of the Syndicate members, as provided in Article VII hereof.

Said first preferred shares shall be subject to redemption, as a whole, on July 1, 1922, by payment of the par value thereof plus a dividend at the rate of fourteen per cent per annum from the date hereof to the date of such payment. Such redemption may be made either from money accruing to the Syndicate from rents in excess of expenditures, or from money borrowed by the Syndicate, or from money furnished by the second preferred, and common shareholders, as hereinafter provided in ARTICLE XIII hereof.

ARTICLE IV.

Certificates shall be issued by second party evidencing the shares of the Syndicate members in substantially the following form:

ARTHUR R. JONES SYNDICATE.

No_____                                            _____Shares

THIS IS TO CERTIFY THAT_____is

the owner of_____ $\begin{cases} \text{first preferred} \\ \text{second preferred} \\ \text{common} \end{cases}$ shares of One Hundred Dollars each of the beneficial interest of ARTHUR R. JONES SYNDICATE established for the purpose of acquiring the property described in a certain Trust Agreement, dated the 1st day of December, 1920, and on deposit with the undersigned as Trustee, being known as

Trust Agreement Number_____

The total par value of the first preferred shares authorized to be issued is Two Hundred Fifty Thousand Dollars ($250,000) and the total par value of the second preferred shares authorized to be issued is Six Hundred Thousand Dollars ($600,000) and the total par value of the common shares authorized to be issued is Sixty-Five Thousand Dollars ($65,000.00).

This certificate and the interest represented hereby shall be subject to all the terms and conditions contained in said Trust Agreement to the same extent and in like manner and with the same force and effect as if said Trust Agreement were fully and at length described herein.

It is expressly agreed that the holder hereof has no claim or interest, legal or equitable, in the property described and referred to in said Trust Agreement,

but only an interest in the net avails or proceeds thereof as in said Trust Agreement provided.

This certificate is transferable only by endorsement on the back of the same and the surrender thereof to the Trustee, when a new certificate will be issued to the transferee.

Chicago, _____, 19_____

CHICAGO TITLE AND TRUST COMPANY,
As Trustee,

By_____

\*     \*     \*     \*     \*     \*   .   \*

## ARTICLE V.

Said Master's certificate has, simultaneously with the execution and delivery of this instrument, been purchased from THE NORTHERN TRUST COMPANY for the sum of _____ Dollars ($_____), and an assignment of said certificate has for the time being been taken in the name of an individual representing second party, and second party guarantees to first parties that such individual is acting solely for second party and that he will execute whatever documents are necessary to assign or convey to second party his interest in said certificate, or the real estate therein described (in case a deed to said real estate shall be taken in his name), free and clear of any defects in title arising by reason of any acts or omissions of such individual or any judgments or claims which may exist against him.

## ARTICLE VI.

The deed to second party, by which the real estate described in said Master's Certificate shall be conveyed to second party, as Trustee, shall recite that said property is conveyed to second party, as Trustee, under the provisions of a Trust Agreement dated the first day of December, 1920, and known as Trust No. _____ (said Trust Agreement being this instrument) and shall contain the following provisions:

"Full power and authority is hereby granted to said trustee to improve, manage, protect and subdivide said premises or any part thereof, to dedicate streets, highways or alleys, and to vacate any subdivision or part thereof, and to resubdivide said property as often as desired, to contract to sell, to sell on any terms, to convey, either with or without consideration, to donate, to dedicate, to mortgage, pledge, or otherwise encumber; to lease said property, or any part thereof, from time to time, by leases to commence in praesenti or in futuro, and upon any terms and for any period or periods of time, not exceeding 198 years, and to renew or extend leases upon any terms and for any period or periods of time, and to amend, change or modify leases and the terms and provisions thereof at any time or times hereafter; to partition or to exchange said property, or any part thereof, for other real or personal property, to grant easements or charges of any kind, to release, convey, or assign any right, title or interest in or about said premises and to deal with said property and every part thereof in all other ways and for such other considerations as it would be lawful for any person owning the same to deal with the same, whether

57694°—27——58

similar to or different from the ways above specified, at any time or times hereafter.

In no case shall any party, to whom said premises, or any part thereof, shall be conveyed, contracted to be sold, leased or mortgaged by said trustee, and in no case shall any party dealing with said trustee in relation to said premises, be obliged to see to the application of any purchase money, rent or money borrowed or advanced on said premises, or be obliged to see that the terms of this trust have been complied with, or be obliged to inquire into the necessity or expediency of any act of said trustee, or be privileged or obliged to inquire into any of the terms of said trust agreement.

The interest of each and every beneficiary hereunder and of all persons claiming under them, is hereby declared to be personal property and to be in the earnings, avails and proceeds arising from the disposition of the premises; the intention hereby being to vest in the said Chicago Title and Trust Company the entire legal and equitable title in fee, in and to all of the premises above described."

The Trustee shall actually have all of the powers above described, so far as concerns the public or any purchaser or person dealing with the Trustee other than the beneficiaries, hereunder, and all such persons shall be entitled to rely upon the powers of the Trustee as set forth in the recorded deed to said Real estate, without restriction by reason of anything herein contained; but as between the Trustee and the beneficiaries hereunder the Trustee shall act only on the written direction of the owners of not less than three-fourths of the shares of the beneficial interest hereunder represented by second preferred and common shares, or in case of arbitration as hereinafter provided for, then on the written direction of the arbitrator, or in case of non-redemption of all of said first preferred shares as hereinbefore provided on July 1, 1922, then and thereafter only on the written direction of the holders of all of the outstanding first preferred shares.

## ARTICLE VII.

The real estate described in said Master's Certificate shall be operated and managed by the Syndicate Members or authorized representatives who shall serve without compensation except as hereinbefore provided.

All action by the Syndicate Members shall be by the assenting vote of three-fourths of all of the outstanding second preferred and common shares, (each share being entitled to one vote), but in case any proposed action shall not receive a three-fourths affirmative vote, but shall receive a majority vote of the outstanding second preferred and common shares, then if such majority shall wish to have the matter arbitrated, the matter shall be referred for decision to the President of Chicago Title and Trust Company, or to some person whom he may designate, and the decision of such arbitrator shall be binding upon all parties concerned; provided, however, that if redemption of all of said first preferred shares as hereinbefore provided shall not be made on July 1, 1922, then and thereafter all action by and on behalf of the Syndicate members, including the matters covered by Articles X, XV, and XVI hereof, shall be solely by the vote of the first preferred shares, each of such shares being entitled to one vote.

Meetings of the second preferred and common shareholders may be called at any time by a majority of such shareholders, and five days' notice of such

meeting shall be given by mailing the same to each of such shareholders at his residence or business address if known, or, if not known, then to such shareholder at Chicago, Illinois.

### ARTICLE VIII.

It is understood that the rentals up to and including December 11, 1920 (in case said property shall not be redeemed or otherwise disposed of by the Syndicate before that time), shall accrue to and belong to said Arthur R. Jones, rather than to the Syndicate.

The surplus of money paid in by the preferred shareholders, after deducting the amount paid to the said THE NORTHERN TRUST COMPANY, in purchase of said Master's certificate, amounts to the sum of _____ Dollars ($_____), which sum shall be deposited in a bank in the name of the Treasurer of the Syndicate, and all other moneys including rents received by the Syndicate Treasurer shall be deposited in such bank account, and disbursements shall be made upon checks signed by the Treasurer of the Syndicate. The Treasurer shall at once pay the general taxes on said real estate for the year 1919 and unpaid installments now due, if any, of special assessments.

In case of redemption, sale or other disposition of the property belonging to the Syndicate, the proceeds thereof shall be received by second party and shall be applied in the order following.

1. To the payment of all debts and obligations of the Syndicate.

2. To the payment of the outstanding first preferred shares of the Syndicate at the rate of One Hundred Dollars ($100) per share plus a dividend thereon at the rate of fourteen per cent. per annum from the date thereof.

3. To the payment of the outstanding second preferred shares of the Syndicate at the rate of One Hundred Dollars ($100.00) per share, plus a dividend thereon at the rate of six per cent. per annum from the date hereof.

4. To the payment of the outstanding common shares of the Syndicate at the rate of One Hundred Dollars ($100.00) per share, plus a dividend thereon at the rate of six per cent per annum from the date hereof.

5. The surplus remaining shall be distributed ratably to the holders of second preferred and common shares without preference to either in proportion to their respective holdings.

The same priorities shall be observed in the distribution of any other syndicate moneys.

### ARTICLE IX.

No shareholder in the Syndicate shall, by reason of being a shareholder, be deprived of the right to purchase the Syndicate property, or any part thereof.

### ARTICLE X.

Except as otherwise provided in Article VII hereof, this trust may be terminated at any time by an instrument in writing signed and acknowledged by the holders of not less than three-fourths of the then beneficial interest hereunder represented by second preferred and common shares, and delivered to said trustee. In any event, this trust shall be terminated at the end of twenty (20) years from the date hereof. Upon the termination of this trust, all of the then undisposed of properties held by the trustee hereunder may be

partititioned among the then beneficiaries hereunder, in such manner as such beneficiaries may by agreement determine, or in default of such agreement and upon proper direction of the holders of not less than three-fourths of the then beneficial interest represented by second preferred and common shares, or of an arbitrator, if arbitration is had, all of said undisposed-of properties may be sold as a whole or in part by the trustee hereunder, at public or private sale or sales. Provided, however, that no such private sale, in case of termination of the trust, shall be made without notice thereof to the shareholders of record at the time, place and terms of such sale, and an opportunity to such shareholders as desire so to do, to buy the property sold in proportion to their respective interests at the same price and upon the same terms as it is proposed to sell the same at such private sale, such notice and offer to shareholders to be in writing and either delivered to them personally or mailed to them at their respective residence or business addresses, if known to the trustee, or if not known, then at Chicago, Illinois, not less than ten days prior to such sale. Upon such sale or sales being made, the trustee shall have the power to convey to any purchaser or purchasers thereat, by deed or deeds without covenants, the said properties, or any part or parts thereof, so purchased, the net proceeds of such sale or sales less the expense thereof to be divided pro rata among the then beneficiaries hereunder according to their respective interest; it being understood that the distribution in such case shall be according to the priorities set forth in Article VIII of this instrument.

## ARTICLE XI.

It is understood and agreed that in all cases under this instrument the parties interested in the earnings, avails and proceeds of this trust, and the extent of their interest, shall be determined by the records of this trust or documents pertaining thereto in the hands of the trustee and the trustee is hereby expressly authorized in all cases to deal with all persons in interest accordingly.

## ARTICLE XII.

If any shareholder in the Syndicate shall acquire a judgment or other lien upon the real estate described in said Master's Certificate, it is understood and agreed that the Syndicate shall have the option to acquire the same at the price paid by such shareholder.

## ARTICLE XIII.

In case redemption of said first preferred shares shall be determined upon by a three-fourths vote of the second preferred and common shares, or by the arbitrator (in case of arbitration), or in case any loan which may be made by the Syndicate shall become due and cannot be renewed it is understood and agreed that the second preferred and common shareholders shall provide, in amounts in proportion to their respective holdings, said redemption money or the amount of said loan, as the case may be, or any amount of cash which it may be necessary to pay on such loan in order to secure a renewal of the balance thereof, and for this purpose there shall be no distinction between second preferred and common shares, and for the money so provided there shall be issued to each person providing the same, to the extent of his contribution, additional second preferred shares at a price of par and accrued

dividend (less dividends already paid) at the rate of six per cent per annum from the date hereof; and in case any second preferred or common shareholder shall default in furnishing his pro rata portion of such redemption money, or the amount of such loan, as the case may be, or the amount of cash which it may be necessary to pay on such loan in order to secure a renewal of the balance thereof, or any part of said pro rata portion, then it is understood and agreed that so many of the remaining second preferred and common shareholders as wish to do so may furnish such portion or part thereof, in proportion to their respective holdings of second preferred or common shares, and receive second preferred shares therefor as aforesaid, and in such event they also shall have, in the same proportion, the option to purchase at any time within thirty days after such default, at a price of par and accrued dividend (less dividends already paid) at the rate of six per cent per annum from the date hereof, the second preferred or common shares, as the case may be, of the shareholder who shall have thus defaulted.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

## ARTICLE XV.

The trustee may resign at any time by giving thirty days' written notice of its intention so to do to the Syndicate members, said notice to be given by mailing a copy thereof to the residence or business address of each of said members so far as the same shall be known to the trustee, and if not known to said trustee, then by mailing a written notice addressed to each of such members at Chicago, Illinois.

In case of resignation from office of second party, as trustee, a successor in trust shall thereupon be appointed (except as otherwise provided in Article VII hereof) by an instrument in writing, signed and acknowledged by the owners of three-fourths of all the outstanding second preferred and common shares, or, in case of arbitration, by the arbitrator, and delivered to the trustee herein, whereupon said Chicago Title and Trust Company, as trustee, shall convey to such successor in trust all of the trust property then unconveyed and undisposed of by a deed without covenants which said deed may recite that same is made subject to any contract or contracts for the sale of said premises, or any part or parts thereof, or any lease or leases, or any incumbrance or incumbrances then outstanding, and shall transfer to such successor in trust all other assets then in its possession and held hereunder. Said successor in trust shall thereupon be vested with all the rights, privileges, powers and duties of the trustee named herein as if this instrument had in the first place been executed by and to such successor as trustee herein. And each succeeding trustee may in like manner resign and another trustee may in like manner be appointed in its place.

## ARTICLE XVI.

Except as otherwise provided in Article VII hereof, if the owners of three-fourths of the outstanding second preferred and common shares, or, in case of arbitration, the arbitrator shall at any time desire to terminate the rights of the trustee acting for the time being under this trust, and appoint a new trustee in its stead, they or he may do so by a written instrument addressed to such trustee acting for the time being, and thereupon like conveyances as in the case of resignation, shall be made by the trustee then acting to the newly

appointed trustee, and thereupon such new trustee shall be vested with all the rights, privileges, powers and duties of the trustees herein, as if this instrument had in the first place been executed by and to such new trustee as trustee herein, and in like manner, a new trustee may thereafter be appointed from time to time by an instrument in writing signed by the owners of not less than three-fourths of the then outstanding second preferred or common shares, or in case of arbitration, by the arbitrator.

### ARTICLE XVII.

If any suit or other legal proceedings shall be instituted wherein the trustee shall be made a party in any manner or capacity by reason of this agreement or by reason of any instrument made by or to it under any of the provisions hereof, then said trustee shall receive and be paid on demand the costs incurred [sic] the reasonable fees of its attorneys for services rendered in any such suit or proceedings; but nothing herein contained shall be construed as requiring said trustee to prosecute or defend any suit or legal proceedings that may be brought as aforesaid. And it is understood and agreed that no acts done by said trustee under this trust or any instrument made by said trustees or to said trustees at any time under any of the provisions of this trust shall in any manner impose any personal obligations or liability on said trustee other than for its gross negligence or abuse of its powers and discretion.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Certificates were issued by the Syndicate to its members as follows:

| | | |
|---|---|---:|
| 1st Preferred | F. C. Austin | $250, 000 |
| 2nd Preferred | H. W. Austin | 50, 000 |
| 2nd Preferred | F. C. Austin | 50, 000 |
| 2nd Preferred | F. Schoenfeld | 35, 000 |
| 2nd Preferred | D. K. Tone | 35, 000 |
| 2nd Preferred | I. Isador | 25, 000 |
| 2nd Preferred | J. W. Wakem | 35, 000 |
| 2nd Preferred | A. R. Jones | 70, 000 |
| Common | A. R. Jones | 65, 000 |
| Total | | 615, 000 |

During the year 1921 the petitioner paid to F. C. Austin for the use of $250,000 advanced by him the following sums on the dates mentioned:

| | |
|---|---:|
| August 4, 1921 | $5, 000. 00 |
| September 6, 1921 | 6, 666. 66 |
| October 4, 1921 | 5, 833. 33 |
| November 8, 1921 | 5, 833. 33 |
| December 6, 1921 | 5, 833. 33 |
| January 11, 1922 | 5, 833. 35 |

About February, 1922, Jones and certain other members of the Syndicate opened negotiations with F. C. Austin with the view of having the Syndicate borrow from an insurance company $500,000 for the purpose of paying Austin the loan of $250,000 with accrued dividends thereon at the rate of 14 per cent per annum. It was the

desire of Jones and the other members of the Syndicate, other than the Austins, that the loan be paid immediately upon the receipt of the $500,000 and that dividends cease at the date of such payment. Austin objected to this and insisted that the 14 per cent per annum be paid to July 1, 1922. The Syndicate was without sufficient funds with which to carry the loan, and the prospects were that it would be unable to liquidate it on July 1, 1922, without securing additional funds or selling the property. It was not considered advisable to sell the property at that time. Thereupon, Austin consented to permit the application for the loan of $500,000 to go through and agreed orally to accept payment of the $250,000 and 14 per cent per annum thereon to April 1, 1922. Early in March, 1922, the application for the loan of $500,000 was executed, and during the night following the day on which this application was mailed to the insurance company at Boston, the building owned by the Syndicate was destroyed by fire originating in an adjoining building. The building was insured. The insurance company paid the money to the Chicago Title & Trust Co., trustees. At the time of the fire Austin demanded $250,000 plus 14 per cent to July 1, 1922. The Syndicate refused payment of the 14 per cent on the ground that it was usurious interest. Negotiations following resulted in Austin being paid $250,000 principal, plus 14 per cent per annum to May 6, 1922.

Petitioner's books were kept and all items of income and deductions, with the exception of the dividends paid to Austin, were included in the return upon the accrual basis. The bookkeepers failed to accrue upon the books the amount of $35,000 due Austin and entered only the payments made, with the result that only the amounts paid were claimed as a deduction in the return.

The petitioner, in making its return for 1921, deducted as interest the sum of $29,166.65 paid to Austin during that year for the use of the $250,000. The Commissioner disallowed the deduction upon the ground that the amount constituted dividends on corporate stock.

OPINION.

SMITH: The question involved in this proceeding is whether the payments to F. C. Austin upon his first preferred shares were in fact distributions of profits to a shareholder or payments of interest on indebtedness. If the latter, they are deductible from gross income; if the former, they are not.

An inspection of the syndicate agreement shows that the certificates of interest held by Austin are throughout the instrument designated as " shares." These shares were subject to redemption, as a whole, on July 1, 1922, " by payment of the par value thereof plus

dividend at the rate of fourteen per cent per annum from the date hereof to the date of such payment." (Art. III.) In case of redemption, sale, or other disposition of the property belonging to the Syndicate, the proceeds thereof were to be applied in the order following:

1. To the payment of all debts and obligations of the Syndicate.

2. To the payment of the outstanding first preferred shares of the Syndicate at the rate of One Hundred Dollars ($100) per share plus a dividend thereon at the rate of fourteen per cent. per .annum from the date thereof. (Art. VIII.)

The first preferred shares had no vote, but " if redemption of all of said first preferred shares as hereinbefore provided shall not be made on July 1, 1922, then and thereafter all action by and on behalf of the Syndicate members, including the matters covered by Articles X, XV, and XVI hereof, shall be solely by the vote of the first preferred shares." (Article VII.)

In *Appeal of I. Unterberg & Co.*, 2 B. T. A. 274, we stated that the name by which an instrument is denominated is not conclusive as to its character and its true nature must be determined by looking to its terms and legal effect. See also *In re Fechheimer Fishel Co.*, 212 Fed. 357, 360; and Fletcher's Cyclopedia on Corporations, vol. 6, p. 6020, where the legal principle is laid down:

Whether or not the holder of a particular instrument or certificate is to be regarded as a stockholder or a creditor is a question of interpretation, and depends upon the terms of his contract as evidenced by such instrument and the corporate charter and the statutes of the state.

We stated, however, in *Appeal of Kentucky River Coal Corporation*, 3 B. T. A. 644, 649, that the name which has been given to a corporate issue is not a thing to be ignored " for it is not lightly to be assumed that parties have given an erroneous name to their transaction."

In *Rider v. Delker & Sons Co.*, 145 Ky. 634; 140 S. W. 1011, it was held that, even though a certificate of incorporation and the certificate of stock itself provided that after five years the holder of preferred stock might demand back his money in the corporation, he can not enforce this provision until the corporate creditors are paid. The court said:

The capital of a corporation is the sum total of its stock, whether common or preferred. Certificates of stock are mere evidences that the holders thereof have invested the sums called for in the certificates in the enterprise. They run the risk of losing their stock if the business is not a success. As between themselves and third persons who deal with the corporation and give it credit, their stock is equally liable. It is only in cases where the corporation is solvent and the rights of creditors will not be injuriously affected thereby that agreements as to preferences among themselves may be enforced. The entire capital,

without regard to any arrangement which may exist between common and preferred stockholders, is at all times subject to and liable for the debts of the corporation, and no part of the capital can be withdrawn from the business until the debts of the corporation are satisfied.

The fundamental characteristic of a share of stock is that the holder is a co-owner of the business and not a creditor. A share of stock carries the right to share in surplus profits and assets after corporate debts are paid. This is shown by the decision in *In re Interborough Realty Co.*, 223 Fed. 646. In that case bondholders sought to prove claims as general creditors. In addition to the ordinary provisions of bonds, the instruments provided for sharing at maturity in net profits. For this reason it was contended that the instrument should be treated as stock. There was no provision in the instruments which would make the claims of the holders for principal and interest subordinate to the claims of general creditors. The court held that the bondholders were promised only repayment of the amount of money loaned with interest, and that the provision to permit holders to share in surplus after payment of debts and 5 per cent on stock did not defeat the bondholder's right to prove as a general creditor for principal and interest. See also *Miller* v. *Ratterman*, 47 Oh. St. 141; 24 N. E. 496; *Warren* v. *King*, 108 U. S. 389; *Hamlin* v. *Toledo, etc. R. R. Co.*, 78 Fed. 664; *Heller* v. *National Marine Bank*, 89 Md. 602; 43 Atl. 800.

The petitioner cites the case of *Savannah Real-Estate Loan & Building Co.* v. *Silverberg*, 108 Ga. 281; 33 S. E. 908, as one tending to support its contentions. In that case the certificates issued by the Loan & Building Co. were designated as shares of preferred stock. They provided cumulative interest of 8 per cent from profits, carried no right to vote, were to be retired at a fixed date, and the holders were not to share in additional profits. The court held these to be certificates of indebtedness. The decision seems to be based on the provisions of the certificates which provided for their retirement upon a specific date and allowed the holders no voice in the management of the affairs of the corporation. There is also the case of *Wright* v. *Johnston*, 183 Iowa, 807; 167 N. W. 680, tending to support the contentions of the petitioner. In that case shares of so-called preferred stock providing a dividend of 8 per cent were issued. The certificates provided that, in the event of dissolution, holders of these shares were to receive par value plus unpaid dividends and no more. They could not vote. They could, on six months' notice, require the corporation to purchase the stock at par, plus unpaid dividends. They could also make the demand if four consecutive dividends were passed. The corporation could retire the instruments on a given notice. No mortgage of corporate assets could be given without their

consent. The court held that holders of these instruments were not shareholders but creditors.

The preponderance of legal authority favors the Commissioner's contentions in this case.

Judged by the tests laid down by the authorities upon this point, we conclude that the first preferred shares issued by the petitioner were not certificates of indebtedness and that the dividends paid upon them were not the equivalent of interest paid upon indebtedness. Austin refused to loan his money to the petitioner at the rate of 14 per centum per annum because he was afraid of the penalties prescribed by the usury laws of the State of Illinois. He was, however, willing to become a preferred shareholder in the Syndicate. To be sure, he saw to it that he got good security as a preferred shareholder. But this alone did not make him a creditor. We are convinced that his money was invested in the business and that he was a co-owner and not a creditor.

In oral argument and by brief counsel for the petitioner have emphasized the point that it is the practice of courts to admit parol evidence to explain the meaning of a written instrument where usury laws are involved. The admission of such parol evidence is justified on the ground that the charge of usury raises a question of the legality of the instrument. *Clemens* v. *Crane*, 234 Ill. 215, 230; 84 N. E. 884; *Ferguson* v. *Sutphen*, 3 Gilm. (Ill.) 547, 566, 567; *Galbraith* v. *Fullerton*, 53 Ill. 126, 128. No question of usury is involved, however, in the instant proceeding, and we are convinced that the nature of the first preferred shares is not changed by the fact that the owner of such shares was to receive a high rate of dividend upon them or that such dividend was paid monthly instead of strictly in accordance with the terms of the agreement.

The petitioner originally insisted that the Syndicate was not taxable as an entity but this contention was abandoned.

> *Judgment will be entered for the Commissioner.*

LITTLETON, dissenting: Whether the amount paid or accrued was intended as a dividend or as interest must be determined from the intention of the parties. An analysis of the document set out in the findings of fact and the evidence presented at the trial convinces me that the $250,000 was intended as a loan and that the 14 per cent per annum was intended as interest for the use of the $250,000.

Section 201 (a) of the Revenue Act of 1921 defines " dividends " as any distribution made by a corporation to its shareholders or members, whether in cash or in other property out of its earnings or profits accumulated since February 28, 1913.

The Commissioner no doubt assumed that the amount paid to F. C. Austin in 1921 was a dividend, because the written agreement calls it a dividend. No dividend was ever declared. The Syndicate applied the earnings from its property for the first six months of 1921 to the payment of taxes due for the preceding year, debts, insurance and repairs. Certain of the obligations for repairs, etc. were deferred and the earnings for the balance of the year were paid to Austin for the use of the money advanced to the Syndicate.

An analysis of article III of the agreement discloses that it does not provide for the payment of any dividend on first preferred shares, except in the case of redemption, and that the first preferred shares held by Austin shall be subject to redemption as a whole on July 1, 1922, upon payment thereof plus a dividend at the rate of 14 per cent per annum from the date thereof to the date of payment; that such redemption may be made either from money accruing to the Syndicate from rents in excess of expenditures, from money borrowed by the Syndicate, or from money furnished by the second preferred and common shareholders, as provided in article XIII. It does not provide for payment of these dividends out of earnings from profits alone. It provides for payment out of borrowed money or for the payment out of the money furnished by other shareholders when there are no profits. Although there were no rents or profits and no money was available as provided in articles III and XIII of the agreement, Austin, under the terms of the agreement, could take possession, sell the property, and reimburse himself for his advancement, plus 14 per cent per annum. He was not dependent upon the earnings or profits for the return of his principal or interest.

Austin had agreed to loan the Syndicate $250,000 at 14 per cent per annum. He knew that the Illinois statutes limited the legal rate of interest to 7 per cent per annum. He feared that some of the members of the Syndicate might object to the 14 per cent per annum and he concluded that the agreement prepared by his attorney should be accepted by the Syndicate to protect him in this matter. It was not his intention to invest the $250,000 at the risk of the enterprise. He had already subscribed $50,000 at the risk of the business and there is no question about that; he was paid neither interest nor a dividend on the $50,000.

The Commissioner contends that we can not inquire beyond the written instrument upon which the transaction was based, but this rule does not apply in proceedings of this character. *Peugh* v. *Davis*, 96 U. S. 332; *Sigua Iron Co.* v. *Greene*, 88 Fed. 207; *O'Shea* v. *New York C. & St. L. R. R. Co.*, 105 Fed. 559; *Mitchell* v. *McShane*

*Lumber Co.*, 220 Fed. 878; *Appeal of J. W. Solof*, 1 B. T. A. 776; *Appeal of Converse & Co.*, 1 B. T. A. 742. The law seems to be well settled that oral evidence is admissible to explain a document where usury is exacted. *Houghton* v. *Burden*, 228 U. S. 161, 169; *Clemens* v. *Crane*, 234 Ill. 215; 84 N. E. 884.

We have the uncontradicted testimony of three witnesses, parties to the transaction, that the money advanced by Austin to the Syndicate was a loan on which the Syndicate agreed to pay interest at the rate of 14 per cent per annum monthly and that the 14 per cent was in fact interest. Thirty-five thousand dollars interest accrued upon this loan and $29,166.65 was paid during 1921. Canceled checks were offered in evidence showing these payments. The Syndicate agreement says nothing about payments in the year 1921, and yet we find that payments were regularly made and received by Austin. This indicates that it was the oral and not the written instrument that controlled the nature of the transaction.

It is not always easy to distinguish between an investment and a loan, or what is dividend and what is interest. The general rule is that whenever a person who advances money is guaranteed the return of his money plus interest so that his principal is never in jeopardy then the transaction is a loan. When one advances money for a business enterprise, depending upon the hazards of the business as to whether he will receive the return of his principal or receive any profit thereon, he becomes a shareholder in the transaction. Austin was guaranteed the return of his money advanced with interest at 14 per cent per annum. This is disclosed not only by the documents set out in the findings of fact but also by testimony submitted at the trial. Looking to the terms and legal effect of the document, and taking into consideration the oral and documentary evidence offered, I am of opinion that the transaction was a loan and not an investment, and that $35,000 which the Syndicate agreed to pay annually in monthly installments was interest and not a dividend. The first preferred certificates issued by the Syndicate to Austin were merely evidence of indebtedness.

KORNER, GREEN, and TRUSSELL concur in the dissent.