[Civ. No. 17148.  Second Dist., Div. Three.  May 15, 1950.]

SILAS L. GILLAN, Respondent, v. BENJAMIN M. STANSBURY et al., Appellants.

O'Melveny & Myers, William W. Clary, Sidney H. Wall and Ernest M. Clark, Jr., for Appellants.

W. P. Smith for Respondent.

SHINN, P. J.—This case is before us on an appeal by Benjamin M. Stansbury and Hugh Gordon, defendants, from a judgment declaring plaintiff, Silas L. Gillan, to be the owner of an undivided one-fourth interest ''in and to any renewal lease from the United States Government by reason of prospecting permit No. Los Angeles 033569, or any rights arising therefrom and/or lease and/or prospecting permit covering the following described land to wit: Northwest quarter of Section 28, Township 11 North, Range 20 West, S. B. M. in Kern County, California,'' a like interest in certain personal property, and awarding plaintiff $2,418.66 from Stansbury as his share of earned profit under a government oil lease.

The prospecting permit was issued by the Department of the Interior to Henning E. Olund, on March 16, 1921, and was assigned by him, as legal owner thereof, to General Petroleum Corporation in 1923. Under this permit an oil and gas lease was issued to General Petroleum by the government on January 10, 1924, which, by its terms, was due to expire January 10, 1944. The lease carried with it a preferential right of renewal. Shortly before its expiration date the lease was purchased from General Petroleum by Stansbury and Gordon. The assignment was taken in the name of Olund and he, as assignee, applied for a renewal. This application was pending at the time of trial. A renewal lease was issued to Olund before final judgment was entered following an accounting. The judgment awards Gillan a one-fourth interest in this lease and in the profits from oil produced.

Plaintiff's claim of title is asserted to have a basis in the following written instruments: (1) An agreement between

Olund, Gillan and Stansbury, as parties of the first part, and Alexander P. Anderson and Lydia Anderson, as parties of the second part, dated July 21, 1922, by the terms of which the Andersons agreed to advance up to $10,000 for the development of the property for a one-fourth interest in the prospecting permit and its benefits and profits, the remaining interests to be held one-fourth each by Olund, Gillan and Stansbury;[1] (2) An agreement dated March 13, 1923, between the four men and their wives, as assignors, and General Petroleum, as assignee, by the terms of which the assignors agreed to assign the prospecting permit to the assignee for a consideration of $320,000 bonus and $2,905.19 for improvements on the land, of which $162,905.19 was to be paid in cash, the balance of $160,000 bonus out of oil, and in addition certain overriding royalties. The bonus and all royalty payments were to be paid one-fourth to Olund, one-fourth to Gillan, one-fourth to Stansbury, one-eighth to Mr. Anderson, and one-eighth to Mrs. Anderson. General Petroleum agreed to drill wells and

---

[1]The agreement recited that the prospecting permit was owned by Olund, Gillan and Stansbury; that the $10,000 to be advanced by the Andersons would be used to grade roads, bring in water, and drill a 500-foot well; that the first parties assigned to the Andersons a one-fourth interest in the prospecting permit and all benefits and profits to be derived therefrom; that if necessary, in order to further comply with the terms of the permit, all parties would sell a half interest for that purpose or convey a half interest to others in order to drill a 2,000-foot well, each of the parties to contribute ratably to the share to be sold. The agreement read, in part, as follows: ''5. In event the parties hereto hereafter make a contract with others to drill said land upon a bonus and royalty or upon a royalty basis, or in case said permit, or any lease hereafter acquired by virtue thereof, be sold outright—then, in either such event, from the proceeds thereof there shall first be deducted all amounts paid by any of the parties hereto for costs or expenses incurred in connection with said permit, including the amount which shall have been paid or advanced by second parties in accordance with this agreement, and such amounts repaid to the respective parties who have so advanced or paid the same; and the balance shall be divided in the proportion of twenty-five (25) per cent to Olund; twenty-five (25) per cent to Gillan; twenty-five (25) per cent to Stansbury, twelve-and-one-half (12.5) per cent to Alexander P. Anderson, and twelve-and-one-half (12.5) per cent to Lydia Anderson.

''6. While said prospecting permit now stands in the name of H. E. Olund individually, and it is the intention of the parties to apply to the secretary of the Interior for approval of the assignments herein mentioned, nevertheless, in event such approval for any reason be not granted by the Secretary of the Interior, it is agreed that the proceeds eventually derived from said permit shall, notwithstanding, be divided in the proportions as hereinbefore set forth.

''7. It is agreed that first parties shall attend to the business of prosecuting the work of complying with the requirements of said permit and obtaining a lessee or purchaser for the same, and shall make no charge for their time or services heretofore or hereafter to be rendered in connection therewith.''

operate the property, and that its agreement should extend "for the full term of and be concurrent with any prospecting permit or lease to the assignee covering said land, and all extensions and renewals thereof," but retained the right to at any time transfer to the assignors all or portions of the land of not less than 10 acres each, and thereby reduce its drilling obligations. The agreement could be terminated for default of the assignee, and in the event of termination the assignee was to forthwith reassign the permit to Olund and request the consent of the Secretary of the Interior thereto. General Petroleum agreed that after the completion of the first well producing oil in paying quantities, it would file and prosecute an application for a government lease, but did not by that agreement, or otherwise, agree to apply for a renewal of any lease.

General Petroleum, upon the execution of the assignment and operating agreement, entered into possession of the property, drilled four wells thereon, and complied with the terms of the permit and the agreement until it received a government lease on January 10, 1924, at which time only two of the wells were producing. Shortly before November 26, 1943, General Petroleum advised the assignors of its intention not to apply for a renewal of its lease. On November 26, 1943, Gillan, Stansbury and Olund met and discussed the decision of General Petroleum and the necessity of filing an application for a renewal of the lease prior to January 10, 1944. General Petroleum was not required to make the application and declined to do so. Less than 60 days remained for securing an assignment of the lease to a corporation or individual who would make the application. No one except General Petroleum's assignee would be qualified to apply for a renewal. General Petroleum would assign the lease only on condition that it be paid a sum, estimated to be $2,500, for its equipment on the property. The parties hoped to find a new operator who would pay this sum, take an assignment of the lease, assume General Petroleum's obligations and apply for a renewal. It was manifest that if they failed in this effort the lease would have to be acquired by other means or all rights in the property would be lost. During the November 26th meeting Gillan announced his refusal to make any effort to find a new operator except upon condition that he receive any bonus paid by an operator he might secure. Stansbury flatly rejected these terms, and the meeting broke up. The Ander-

sons were in Minnesota; Olund had little interest in the project; and since Gillan refused to cooperate in seeking a new operator except on terms that Stansbury rejected, Stansbury undertook to save the project by acquiring in some manner the General Petroleum lease. Gillan did nothing. With respect to his conduct after the November meeting he testified: ''I was not attempting to make any deal, I was just sitting tight to see what Stansbury could do in the way of getting a new operator.'' This continued to be his attitude while Stansbury was putting forth diligent efforts. Through those efforts Gordon was brought into the enterprise and financed the purchase of the General Petroleum lease and property for the sum of $3,357. After the lease was assigned to Olund, Stansbury, acting as his attorney in fact, caused to be filed and prosecuted an application for a renewal lease and entered into an agreement with the Secretary of the Interior to fulfill the terms of the lease, pending a decision on the application. Although Gillan knew that Stansbury had taken over operation of the property it was not until June of 1944 that he contacted Stansbury. At that time he asserted that he still retained an interest in the enterprise when he met with Gordon, Stansbury and Olund in Gordon's office. Gordon had understood from Olund and Stansbury that Gillan had given up whatever interest he had and made his investment with that understanding. Stansbury asserted at the meeting that Gillan no longer had any interest. Gillan made an effort through the Department of the Interior to assert a right in Olund's pending application for a renewal lease, but this effort was fruitless, since he was unable to furnish evidence of such an interest. He later tendered to Olund two checks for $40 each, as one-fourth of the annual cash rental due to the government, and thereafter endeavored to pay to the land office an entire year's rental of $160 after the same had been paid by Stansbury. It was not until the trial of the present action in May of 1947 that he offered to bear any of the expense of his former associates in acquiring the lease and operating the property. In the meantime a'performance bond of $5,000 had been furnished, as required by the government, and the surety had been indemnified in the amount of $1,000. Stansbury had complied with the lessee's obligations for more than three years. The production from the wells was only 16 barrels per day. The property was located about 100 miles from Los Angeles where Stansbury had his office. The operation was burdensome, entailing much detailed super-

vision and the advancement of money for maintenance, repairs and improvements. Nevertheless, the operation was successful in a small way and by the time the case came on for trial, one-fourth of the profits which Gillan was claiming would have exceeded the share of expense and outlay which he offered to pay.

A lease was issued to Olund in September, 1947; it was assigned to Gordon who entered into an operating agreement with Richfield Oil Corporation in June, 1948, under terms and conditions somewhat similar to those of the General Petroleum agreement. Stansbury and Gordon had previously acquired the royalty interests of Olund and the Andersons, but Gordon made his investment and acquired the lease and Richfield took its agreement with notice of the Gillan royalty interest. Gordon admittedly had knowledge of the joint venture relationship at the time he acquired his interest. By the terms of the agreement with Richfield, and because of Gillan's claims, one-fourth of the consideration for the lease and one-fourth of the royalties were to be impounded pending the determination of the present action. Richfield is not a party to the action, and the judgment does not purport to adjudicate any rights as between Gillan and Richfield. It may be mentioned, however, that under the Richfield agreement one of its obligations will be to recognize the rights of Gillan as they are finally declared in the present action.

In reviewing the findings and judgment it is necessary to define the relations and reciprocal rights of the parties under their agreements as they existed at the time of the November, 1943, meeting. Three separate interests in the property existed, (1) the government's ownership of the land and the rights of a lessor, (2) the leasehold interest owned by General Petroleum, and (3) the overriding royalty interests owned by the joint adventurers.

The royalty owners, individually or collectively, had no claim upon, or any right to acquire, any interest in the leasehold estate of General Petroleum. Although the scope of the joint venture originally encompassed physical operations on the property sufficient to meet the requirements of the permit, the associates were relieved of this obligation by their agreement with General Petroleum. The scope of the joint venture was thereby narrowed to the mere ownership of royalties. Acquisition by the royalty holders of their lessee's interest in the property and operations of their own for the production of

oil were not within the contemplation or engagements of the parties as expressed in the original agreement or the agreement with General Petroleum. The terms of the latter agreement covered the lease that was issued in January, 1924, "and all extensions and renewals thereof." The leasehold estate of General Petroleum could be acquired only by purchase and the associates had no preferred right of purchase. Any assignee of the lease with notice would take it subject to the obligation to pay the reserved royalties during the full term of the original lease and any extension or renewal thereof. (*Schiffman* v. *Richfield Oil Co.*, 8 Cal.2d 211, 225-227 [64 P.2d 1081] ; *Recovery Oil Co.* v. *Van Acker*, 79 Cal.App.2d 639 [180 P.2d 436].) The royalty interests were several, absolute and unconditional. The lessee's interest owned by General Petroleum was entirely distinct and separate from the royalty interests of the joint adventurers, and would remain so in the hands of a transferee of the lease.

The present controversy between Gillan on the one hand, and Stansbury, Gordon and Olund on the other, arises out of the purchase of the General Petroleum lease. It is Gillan's contention that by reason of a fiduciary relationship existing between all the parties to the joint venture agreement, the purchase of the lease by Stansbury, Olund and Gordon would, as a matter of law, inure to the benefit of all the parties. Stansbury and Gordon, who are the only appellants, contend that the purchase of the leasehold was not within the scope of the joint venture, but was in fact a new enterprise in which Gillan did not participate, and had no right to participate.

Before we consider these respective contentions further, it should be mentioned that the controversy has been over Gillan's claim to an interest in the lease, and not over his royalty interest. The evidence does not disclose that the royalty interest was discussed by the parties in any of their conferences. It is assumed in the briefs that Gillan has no interest unless it is an interest in the lease. The facts of the case demonstrate that this assumption is not warranted.

The several rights to receive royalties were incorporeal interests in real property. (See *La Laguna Ranch Co.* v. *Dodge*, 18 Cal.2d 132 [114 P.2d 351, 135 A.L.R. 546].) In the absence of some new agreement the Gillan royalty interest was not affected by the purchase of the General Petroleum lease. It is clear that unless Gillan's interest has been sold, or otherwise disposed of, or abandoned, Gillan has the same right to receive royalties from appellants or their assignee as he would have

had from any other purchaser of the lease who took with notice. It is not contended that Gillan ever transferred this interest. The only theory advanced by appellants is that he in some manner abandoned the entire project. If it be true that he had a right to participate with the others in the purchase of the General Petroleum lease, and could not be excluded legally, it would result that the judgment awarding him a one-fourth interest in the lease represents a correct decision. If, however, appellants were not fiduciaries with respect to the purchase of the lease, that is to say, if that was a new undertaking not within the scope of the joint venture, the judgment is erroneous. But even if Gillan is not accorded the status of a coadventurer with respect to the ownership of the General Petroleum lease he is nevertheless the owner of his original royalty interest. (On April 15, 1931, the royalty obligations of General Petroleum were reduced by agreement with the joint adventurers. Our references to royalty obligations are to such obligations, as modified by agreement of all the coadventurers.) If it be true, as appellants contend, that Gillan failed in his duty to cooperate in finding a new operator for the property and other efforts to avoid loss of the lease, it does not follow that he abandoned or forfeited his royalty interest. This aspect of the case as we say was never discussed by any of the parties in their conferences. Gillan never demanded royalty payments and appellants never offered to make them. Appellants rely upon their claim that Gillan abandoned all interest in the enterprise and that they are not accountable to him as a coowner of the lease. The evidence does not substantiate the claim that Gillan abandoned any of his rights. The fact that he claimed an interest in the lease and did not demand the payment of royalties indicates that if he had been allowed to participate in the operation of the property he would not have expected to be paid royalty. There would have been no reason for the operators to pay royalties to themselves. It may be conceded that if Gillan has an interest in the lease he cannot also claim royalties as a sublessor, but it is clear that if he has no interest in the lease he still retains his royalty interest. We have concluded that he has no legal or equitable interest in the renewal lease.

There could be but two theories evolved from the admitted facts under which Gillan would be the owner of even an equitable interest in the lease itself. One would be that he had such an interest by virtue of the original·joint venture agree-

ment, notwithstanding the assignment of the prospecting permit to General Petroleum and the operating agreement with that company. This theory is clearly unsound. Granting that Olund's associates originally had equitable interests in the permit and any lease that might be issued thereunder, they all exchanged these interests in their entirety for royalty interests in production. No one of them retained any other interest whatsoever except the right to have the lease reassigned to Olund in case General Petroleum should default under its agreement. This event did not occur.

We do not agree with the contention of appellants that the joint venture was wholly terminated when the prospecting permit was assigned to General Petroleum in return for the royalties agreed to be paid. The scope of the joint venture, however, was greatly diminished. As long as General Petroleum performed under the operating agreement the joint adventurers had no present rights other than their royalty rights. Nevertheless there was a possibility that General Petroleum might become in default and forfeit the lease to Olund, or might relinquish all or certain 10-acre parcels of the land. If either of these events had occurred the associates would have been restored in certain respects to their original position. They would have found it necessary for the prosecution of the original undertaking to find a new operator for the property, and they would have been required to pay the government the annual cash rental. But they would have been under no obligation to each other to operate the property for themselves, or to contribute any labor or expense necessary in such operation. Their only obligation toward development as expressed in the June, 1922 agreement was to meet the requirements of the permit, namely, within a specified time to drill a 500-foot well and within an additional time a 2,000-foot well. Even though there was no more than a possibility that General Petroleum would abandon the property before the expiration date of the lease, the joint venture relationship was kept alive by that possibility, but only as to what remained to be done within the scope of the agreement. From the time the agreement was made with General Petroleum the relation of the royalty holders to the property was comparable to that of sublessors. As long as General Petroleum held the lease the associates had not the slightest interest in the leasehold estate. As we say, if the lease had been forfeited or surrendered, development and production operations would have been at a standstill, and could have been undertaken as a joint

venture only through a new agreement. When Olund and Stansbury found it necessary to purchase the lease and equipment they had no duty to invite Gillan to join with them. He had the same opportunity as they had to acquire the lease, and to devise ways and means for undertaking the operation of the property. No general fiduciary relationship exists between parties to a joint venture. The fiduciary duties are no broader than the business and activities encompassed by the joint venture agreement. A relationship of joint adventurers or coowners among several parties solely as lessors of property does not, by operation of law, or without special agreement, entitle all of them to share in the leasehold estate acquired by one or more of them by purchase from the lessee. (See *London Extension Mining Co.* v. *Ellis,* (10 Cir.) 134 F.2d 405, 411-412; *Fleming* v. *Casady,* 202 Iowa 1094 [211 N.W. 488, 494]; *Ramberg* v. *Wahlstrom,* 140 Ill. 182 [29 N.E. 727, 33 Am.St.Rep. 227].) This is substantially what Gillan has been endeavoring to do, and it is what he has seemingly accomplished by the judgment. Even if he had offered in the beginning to join Stansbury and Olund in acquiring the lease they would have been under no duty to accept him as a partner. Each of them had, at least, an implied duty to endeavor to find a new operator for the property. If they had succeeded all would have shared equally in their success. Gillan, as we say, did nothing, and is in no position to complain that Stansbury and Olund failed to find a new operator. There was no secrecy about the matter. One who has had a fair and equal opportunity with his associates to act with them and who refuses to do so, but ''sits tight'' waiting for the others to pull the chestnuts out of the fire, has no grounds for complaint if the efforts put forth by his associates fail, and he is left out of a new undertaking which they are obliged to launch. The purchase of the lease and undertaking to operate the property was a distinctly new enterprise and not a mere continuation of the original one. In the absence of a new agreement Gillan was under no obligation to contribute any portion of the cost of the lease or the expense of operation, nor would he have been under any liability to share in the losses if the undertaking had proved unprofitable. (See *Fuller* v. *Laws,* 219 Mo.App. 342 [271 S.W. 836].)

The second theory would be that the acquisition of the lease from General Petroleum by Olund was pursuant to a new joint venture agreement between Gillan, Stansbury and Olund. It is not contended by Gillan that any such agreement was

entered into. The evidence, including that of Gillan, conclusively shows there was no such new agreement.

Our conclusion that Gillan is not the owner of an interest in the lease as a coadventurer necessarily results from the fact that Stansbury and Olund were not guilty of any breach of fiduciary duty in acquiring the lease for themselves, and therefore were under no duty to take Gillan in with them in acquiring the lease.

One of Stansbury's contentions is that if Gillan was part owner of the renewal lease he, Stansbury, should have been awarded substantial compensation for his services in securing the lease and negotiating with Richfield. Under our holding that Gillan was not part owner of the lease it would follow that Stansbury's services were not rendered in Gillan's behalf but on behalf of himself and Gordon. Gillan's royalty interest is not chargeable with any part of their expenses.

By his complaint Gillan sought declaratory relief. Although he has not contended that he still retains a royalty interest in production by virtue of the several agreements with his associates his claims have had a broader base. The evidence in the case was comprehensive and permits of a full declaration of the rights of the parties. Only limited issues remain for determination.

Plaintiff is entitled to a judgment against Benjamin M. Stansbury in an amount equal to one-fourth of the royalty from production from January 8, 1944 until the operation of the property was taken over by Richfield, as evidenced by its agreement dated June 10, 1948. The total royalty for this period will be computed in accordance with agreements in force at the time General Petroleum assigned its lease to Olund. If Gordon does not consent that judgment for this amount be entered against him, as well as against Stansbury, the court should determine the matter of his liability. Stansbury is not entitled to any allowance for services as an offset against royalties payable by him, and Gillan is not entitled to share in the profits of the operation of the property between January 8, 1944 and June 10, 1948. As between Gillan and appellants the judgment should also declare that Gillan has no interest in the renewal lease heretofore issued to Olund and assigned to Gordon, or the personal property in question, but has a right to receive as royalty, now accrued, and any that may accrue under the Richfield agreement, and from any production under the Gordon lease or any other lease founded upon the Gordon lease, the proportion or value of production

equal to one-fourth of the royalty payable by General Petroleum under agreements in force at the time its lease was assigned to Olund. The judgment should also declare that Gillan is not entitled to share in any bonus paid or agreed to be paid by Richfield for the lease. The bonus belongs to the owners of the lease. It represents consideration given for the agreement entirely separate from royalty obligations, and from Gillan's reserved interest in royalty, which is based solely on production.

The judgment is reversed and the trial court is instructed to determine the amounts and percentages necessary to render judgment in accordance with the views herein expressed and to enter judgment therefor. No costs on appeal.

Wood, J., concurred.

Vallée, J., being disqualified, did not participate.

A petition for a rehearing was denied June 8, 1950, and respondent's petition for a hearing by the Supreme Court was denied July 13, 1950. Carter, J., and Schauer, J., voted for a hearing.