[L. A. No. 21607.   In Bank.   Apr. 2, 1952.]

JOHN P. ANDERSON et al., Appellants, v. BENJAMIN M. STANSBURY et al., Respondents.

A. J. O'Connor for Appellants.

Dunlap, Holmes, Ross & Woodson, Robert H. Dunlap, Kenneth A. Millard, O'Melveny & Myers and William W. Clary for Respondents.

SPENCE, J.—Plaintiffs appeal from a judgment of non-suit in an action for declaratory relief, an accounting, and a declaration of trust with regard to certain oil rights.

Plaintiffs argue that a nonsuit was improperly granted because there is evidence in the case which, when considered in its most favorable aspect, would sustain their case. (*Estate of Arnold,* 16 Cal.2d 573, 576-577 [107 P.2d 25] ; *Easton v. Ash,* 18 Cal.2d 530, 538 [116 P.2d 433].) However, a review of the record indicates that their claim is without merit as a judgment in their favor could not be sustained.

On March 16, 1921, the Department of the Interior of the federal government issued to Henning E. Olund an oil and gas prospecting permit covering certain land in Kern County. (U.S.C.A., tit. 30, § 181 et seq.) In 1922 defendants Olund, Benjamin M. Stansbury and Silas Gillan entered into an agreement with Alexander Anderson and his wife, whereby the Andersons were to advance up to $10,000 for the development of the property in return for a one-fourth interest in the permit. The three others were to hold the remaining interests, one fourth each, and Olund continued as record owner with the government. In 1923 the permit was assigned to General Petroleum Corporation. At the same time an operating agreement was executed between the permittees and the oil company, whereby the oil company (1) assumed the permittees' obligations to develop the property and (2) agreed to the consideration of $320,000 bonus and $2,905.19 for improvements on the land, with the permittees to receive, according to their respective interests, $162,905.19 in cash, $160,000 from the oil produced, and in addition certain overriding royalties. On January 10, 1924, the government issued a 20-year lease to General Petroleum.

Following execution of the operating agreement, General Petroleum took possession of the property and drilled four wells thereon. The wells did not produce oil in sufficient paying quantities to make the lease profitable. Thereafter no more wells were drilled and pumping operations were confined to only two wells. This was the prevailing situation as the time approached for renewal of the lease—January 10, 1944. A few months prior to the expiration date, General Petroleum advised the permittees that it was not interested in continuing the lease and would make a reassignment on condition that it be paid for its pumping equipment on the property. The lease carried a preferential right of renewal for successive 10-year periods.

Meanwhile the original Anderson permittees had died and their interest had passed to their children, plaintiffs herein. On January 3, 1944, General Petroleum assigned the old lease to Olund. For several months thereafter defendant Stansbury in California carried on extensive correspondence with plaintiffs, living in Minnesota, advising them of these circumstances: that it was necessary for the permittees to furnish money for purchase of General Petroleum's pumping equipment and for the cost of procuring a surety bond required for renewal of the lease; and that they also must find a new operator to take over the lease and continue with development of the property. Neither Olund nor Gillan was willing to contribute to these expenses. Despite Stansbury's repeated urging of plaintiffs to "join in" the deal which he considered an "excellent investment," plaintiffs, in April, 1944, replied to Stansbury that "after carefully appraising the total situation" and upon "an impersonal analysis of these properties as investments," they did not wish to "continue holding these interests."

Stansbury then arranged for defendant Hugh Gordon to take over plaintiffs' interest. In April, 1946, Stansbury wrote to plaintiffs, expressing his regret that they had elected not to "join in the renewal application" and requesting their execution of a disclaimer required by the government "for the purpose of clearing the record in connection with . . . application for issuance of renewal lease." Apparently before the government would approve the assignment of the old lease to Olund and issue a renewal lease, it required a waiver of all overriding royalties in excess of 5 per cent, and Stansbury so informed plaintiffs by letter in early May, 1946. Plaintiffs executed the desired disclaimer dated May 17, 1946, and sent it to Stansbury. It recites that plaintiffs have "heretofore abandoned and hereby disclaim any and all interest and rights including royalty reserved" under the operating agreement as executed by the original permittees, and that Olund or "any person or persons other than" plaintiffs may apply for renewal of the lease.

Gordon financed the purchase of the General Petroleum lease and pumping equipment for $3,357, and arranged for the bond required by government regulations. In September, 1947, the lease was renewed to Olund, and he assigned it to Gordon. In June, 1948, Richfield Oil Company took over the lease, with an operating agreement with Gordon

under terms and conditions somewhat similar to those of the General Petroleum agreement.

Stansbury diligently took care of the many details arising from the management of the project incident to the purchase of the equipment from General Petroleum, operation of the property until consummation of the agreement with Richfield, and negotiations with the government and with Richfield. Gillan had contributed some delay rental money but he would not enter into any agreement to share expenses in connection with renewal of the lease. Later when Gillan asserted a right to participate in the profits resulting from operation of the property after expiration of the old lease, he was restricted to royalties only. (*Gillan* v. *Stansbury,* 97 Cal.App.2d 502 [217 P.2d 1016].)

During negotiations in the early part of 1947 with Stansbury, Richfield's counsel examined plaintiffs' disclaimer, expressed dissatisfaction with its sufficiency, and advised Stansbury that an assignment should be procured. While disagreeing with Richfield's counsel as to the need for such further form of relinquishment from plaintiffs, Stansbury, also an attorney at law, in May, 1947, sent to plaintiffs a second instrument for execution, a disclaimer and assignment. As recompense for the nuisance of signing this additional document, he enclosed a check for $800. In June, 1947, Stansbury conferred with plaintiffs in Chicago. When questioned at the trial as to the purpose of the meeting, Stansbury denied that it was to revive plaintiffs' interest in the application for the renewal lease. Defendants' counsel then objected to any further testimony along that line, and he was sustained. Thereupon plaintiffs made an offer to prove that (1) at the meeting Stansbury, on behalf of himself and Gordon, agreed that plaintiffs should retain their one-fourth interest in the oil venture, but stated that in order to satisfy Richfield, plaintiffs would be required to sign the assignment; (2) in pursuance of such understanding, plaintiffs were willing to execute the desired assignment and agreed to return the uncashed $800 check; and (3) by letter a month later, July, 1947, Stansbury confirmed this arrangement with plaintiffs, suggesting that plaintiffs not return the letter which Stansbury had previously sent to them with the assignment because it stated that plaintiffs had "no further interest in the lease, legal or equitable," and "under the proposed arrangement that would not be strictly true." In August, 1947, plaintiffs returned

the $800 check to Stansbury; and in September they sent him the executed assignment.

Following consummation of the operating agreement in June, 1948, with Stansbury and Gordon, Richfield undertook further well drillings, demonstrated that the oil property covered in the permit was potentially valuable, and paid the remaining permittees a bonus of $100,000 for the right to operate under the renewal lease. (See *Gillan* v. *Stansbury, supra,* 97 Cal.App.2d 502.)

Thereafter plaintiffs filed this action, claiming that their second instrument of disclaimer and assignment was secured by the fraud of Stansbury, that they signed such instrument upon his representation that it was only to clear title so Richfield would assume the obligations of the permit, and that they would still retain their one-fourth interest; and that they reposed great trust and confidence in Stansbury as the result of his years of friendly dealings with their parents with regard to this oil permit. Plaintiffs prayed for a declaration of their rights in the renewal lease and operating agreement with Richfield; an accounting as to the revenues received from operation of the property since the expiration of the old lease in January, 1944; and a declaration of trust in defendants for the benefit of plaintiffs as to their alleged continuing one-fourth interest.

At the trial it appeared that no written memorandum was made of the agreement which plaintiffs asserted Stansbury made with them for retention of their one-fourth interest in the oil property. The court held that the purported verbal agreement was within the provisions of the statute of frauds and in the absence of a written memorandum, it could not be established by the testimony of plaintiffs' witnesses. The court further held that defendants were not chargeable with fraud in the negotiations with plaintiffs, and granted defendants' motion for a nonsuit. From the ensuing judgment, plaintiffs appeal.

In clarification of the rights of the parties, attention is first directed to the case of *Gillan* v. *Stansbury, supra,* 97 Cal.App.2d 502. There the same original lease, renewal lease and operating agreement with Richfield were involved in determining the interests of Gillan as one of the original permittees. Gillan asserted a one-fourth interest in the renewal lease and in the profits from the oil produced, commensurate with his status under the original joint venture among the parties. The court analyzed the purport of the

original lease to General Petroleum and its operating agreement for development of the property, and distinguished between the leasehold interest of the lessee and the overriding royalty interests retained by the joint adventurers. Gillan did contribute some renewal rental payments but he did not assume any obligations or enter into any agreement with Stansbury and Gordon for effecting a renewal of the original lease or locating a new operator for the property. The court held that the latter were not fiduciaries with respect to the purchase of the original lease, that Gillan had an opportunity to participate in that venture if he had chosen to so act, and that such purchase was a "new undertaking not within the scope of the joint venture." (P. 509.) However, while declaring that Gillan was not entitled to an interest in the renewal lease or any bonus received by virtue of the new operating agreement with Richfield, the court held that since Gillan had not abandoned or disclaimed his royalty interests in the oil production, he was entitled to his proportionate share of the royalty payments.

The instant case presents for determination the effect of the negotiations between plaintiffs and Stansbury in divesting plaintiffs of all interest in the property. On this appeal plaintiffs argue these points: (1) fraud in the negotiations on the part of Stansbury, particularly arising from an alleged relationship of attorney and client between them and him; (2) error by the court in sustaining objections to the offered testimony as to the asserted verbal agreement made between plaintiffs and Stansbury following their execution of the first disclaimer and prior to the execution of the second; (3) evidence of plaintiffs' part performance of the undertaking to repurchase an interest in the permit, removing their claim from the interdiction of the statute of frauds; and (4) equitable estoppel effecting the enforcement of a constructive or resulting trust in plaintiffs' favor to a one-fourth interest in the permit.

■ The record discloses no fraud or misrepresentation in Stansbury's dealings with plaintiffs. He appears to have had a long business association with plaintiffs' parents, looking after their interests in the oil investment in this state and acting for them under a power of attorney with regard thereto. The relationship seems to have been more akin to businessmen engaged in a joint venture than that of attorney and client. In any event there appears to have been no fiduciary duties owing by Stansbury to plaintiffs in

succeeding property negotiations. Nevertheless, and assertedly because of his close relation with plaintiffs' parents, Stansbury made every effort to protect plaintiffs' interests in the investment. He fully advised them of their right to participate in keeping the permit in force and in the renewal of the lease; and of the contribution required of them for their continuance with the new undertaking. In fact, he urged plaintiffs to join in the proposed deal with the other permittees, expressed great concern lest he might not present it to them in the "best possible light" in conformity with his belief that it was an "excellent investment," and stated that he hoped that they would "decide to stay in" because it looked "quite promising" to him. Despite such express advice from Stansbury not to withdraw from the enterprise, plaintiffs decided not to "continue holding [their] interests," and they declined to contribute any part of the expenses required to finance the new development.

Plaintiffs now claim that Stansbury misrepresented the expenses required for renewal of the lease by including the purchase price of General Petroleum's pumping equipment on the property and requesting plaintiffs to advance one fourth of that amount if they wanted to participate in the new undertaking on the same proportionate basis as prevailed in the original venture. But the purchase of this equipment was part of the arrangement with General Petroleum in exchange for its waiver of the right to renew the lease. Stansbury properly submitted to plaintiffs the full expenses which would be necessary for the successful undertaking of the new enterprise and a statement of the amount of their pro rata contribution if they wanted to share in the proceeds. In so advising plaintiffs, Stansbury was simply stating the terms of negotiation with General Petroleum and the basis upon which they might join in the new undertaking, and there is no evidence whatever of any misrepresentation with respect thereto.

Some two years later plaintiffs executed their formal disclaimer and abandonment of "any and all interest and rights including royalty reserved," again indicating their purpose to terminate all connection with the investment, including the right to royalty payments. Apparently they believed the property to have little value, and wishing to have no further obligations in the conduct of any new oil producing enterprise thereon, they were willing to have others

proceed with it. Meanwhile it was only through the endeavors of Stansbury and his associates that the permit was kept alive, culminating in the renewal lease and operating agreement with Richfield. As was aptly said in *Gillan* v. *Stansbury, supra,* 97 Cal.App.2d 502, at page 511: "One who has had a fair and equal opportunity with his associates to act with them and who refuses to do so, but 'sits tight' waiting for the others to pull the chestnuts out of the fire, has no grounds for complaint if . . . he is left out of a new undertaking which they are obliged to launch."

■ The alleged agreement between plaintiffs and Stansbury after execution of the disclaimer concerned incorporeal interests in real property. (See *La Laguna Ranch Co.* v. *Dodge,* 18 Cal.2d 132 [114 P.2d 351, 135 A.L.R. 546].) Such agreement, if it existed, is barred by the statute of frauds by reason of the absence of a "memorandum thereof . . . in writing and subscribed by the party to be charged." (Civ. Code, § 1624, subd. 4.) Accordingly, objections to testimony relative to the agreement were properly sustained. (Code Civ. Proc., § 1973, subd. 4.) ■ The letter of July, 1947, which Stansbury wrote to plaintiffs a month after their Chicago meeting, and which allegedly confirmed his agreement there made that plaintiffs should retain a one-fourth interest in the permit, is clearly insufficient as a memorandum in satisfaction of the statute. It merely describes plaintiffs' interest in the new undertaking as something to be determined by "future developments," an agreement to negotiate further, but no specific terms are mentioned. With reference to the "proposed arrangement" to have plaintiffs come back into the deal, Stansbury stated in that letter that it "would not be strictly true" to say that plaintiffs had "no further interest in the lease, legal or equitable." In short, the letter manifests no more than a proposal that plaintiffs rejoin the enterprise on such basis as future discussion might indicate, but it does not constitute the required memorandum of terms of agreement between the parties.

■ Nor may plaintiffs successfully invoke the doctrine of part performance to overcome the bar of the statute of frauds. Before a party can be estopped to assert the statute due to the other's part performance, it must appear that a sufficient change of position has occurred so that the application of the statutory bar would result in an unjust and unconscionable loss, amounting in effect to a fraud.

(*Mason* v. *Home Ins. Co.*, 10 Cal.App.2d 696, 698 [52 P.2d 491]; see 23 Cal.Jur., § 33, p. 464-465; anno. 101 A.L.R. 923.) The only change of position cited by plaintiffs is (1) the return of the $800 check and (2) execution and delivery of the second disclaimer and assignment following the alleged verbal agreement made with Stansbury at the Chicago meeting in June, 1947. ▆ The payment of money is not "sufficient part performance to take an oral agreement out of the statute of frauds" (*Shive* v. *Barrow*, 88 Cal. App.2d 838, 848 [199 P.2d 693]), for the party paying money "under an invalid contract . . . has an adequate remedy at law." (*Woerner* v. *Woerner*, 171 Cal. 298, 301 [152 P. 919]; also *Paul* v. *Layne & Bowler Corp.*, 9 Cal. 2d 561, 565 [71 P.2d 817]; *Trout* v. *Ogilvie*, 41 Cal.App. 167, 171 [182 P. 333].) ▆ The further act of execution of the second disclaimer, in relinquishment of a nonexistent interest, clearly cannot qualify as the required unconscionable loss. By the first disclaimer in May, 1946, plaintiffs had expressly and completely divested themselves of all interest in the permit. At the trial plaintiff John Anderson admitted that the purport of the relinquishment was to state "in more formal language the same type of intent as expressed" in the letter to Stansbury some two years earlier—their decision not to "continue holding [their] interests." Having nothing left to assign, the second disclaimer could not have effected a change of position within the scope of the part performance principle.

It is apparent from the foregoing discussion that there is no evidence of fraud, undue influence, unjust enrichment, or the like which would support plaintiff's assertion of a constructive trust, nor is there evidence to support a finding of a resulting trust. (Civ. Code, §§ 2223, 2224; *Simpson* v. *Gillis*, 1 Cal.2d 42, 53-54 [32 P.2d 1071]; *Bainbridge* v. *Stoner*, 16 Cal.2d 423, 428-429 [106 P.2d 423].) Only passing reference need be made to the cases which plaintiffs cite for example of the imposition of a trust so as to prevent an unconscionable injury (*Webb* v. *Vercoe*, 201 Cal. 754 [258 P. 1099, 54 A.L.R. 1200]; *Robertson* v. *Summeril*, 39 Cal.App.2d 62 [102 P.2d 347]) and for aplication of the doctrine of equitable estoppel to preclude reliance on the statute of frauds. (*Seymour* v. *Oelrichs*, 156 Cal. 782 [106 P. 88]; *Notten* v. *Mensing*, 3 Cal.2d 469 [45 P.2d 198].) They are so basically dissimilar as to have no relevancy here. (See *Shive* v. *Barrow*, 88 Cal.App.2d

838, 846-847 [199 P.2d 693].)  In line with these views, defendants had no duty to make an accounting to plaintiffs with respect to their operation of the property following the expiration of the old lease.  (*Simpson* v. *Gillis, supra.*)

From what has been said, it appears that the trial court properly granted the nonsuit as to plaintiffs' alleged causes of action for an accounting and for a declaration of trust. ■ However, plaintiffs' complaint also included a count for declaratory relief, and the disposition of such count would ordinarily require an express declaration of the rights of the parties.  (*Essick* v. *City of Los Angeles,* 34 Cal.2d 614, 624 [213 P.2d 492] ; *Kessloff* v. *Pearson,* 37 Cal.2d 609, 613 [233 P.2d 899].) ■  While the trial court therefore erred in entering a nonsuit rather than a declaratory judgment in disposition of the count for declaratory relief, such error cannot be deemed prejudicial here.  Any declaration of the rights of the parties would necessarily have been unfavorable to plaintiffs in conformity with the disposition of the other two counts, which latter disposition constituted the equivalent of an express declaration that plaintiffs had failed to establish any rights.  Under such circumstances, the procedural error of the trial court does not constitute ground for reversal of the judgment.  (Const., art. VI, § 4½.)

The judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Schauer, J., concurred.