[Civ. No. 55031. Second Dist., Div. Two. Mar. 29, 1979.]

**OREN REALTY & DEVELOPMENT COMPANY, INC., et al.,**
Petitioners, v.
**THE SUPERIOR COURT OF LOS ANGELES COUNTY,**
Respondent;
**EDWARD KU et al., Real Parties in Interest.**

[Civ. No. 55032. Second Dist., Div. Two. Mar. 29, 1979.]

**OREN REALTY & DEVELOPMENT COMPANY, INC., et al.,**
Petitioners, v.
**THE SUPERIOR COURT OF LOS ANGELES COUNTY,**
Respondent;
**WALTER YUAN et al., Real Parties in Interest.**

## COUNSEL

Ruderman, Levin, Ballin, Plotkin & Graf and Harmon R. Ballin for Petitioners.

No appearance for Respondent.

Lum & Ku and Thomas E. Elenbaas for Real Parties in Interest.

## OPINION

**ROTH, P. J.**—Respondent court denied a motion for summary judgment. We issued an alternative writ of mandate on application of petitioners based on our conclusion the subject matter detailed in the

application is typical of numerous similar situations which impel disposition on the basis of the statute of frauds (Civ. Code, § 1624)[1] and requested respondent court to justify said denial.

Respondent court denied the motion on the ground that the evidence raised a triable issue of fact, which if found in favor of real parties in interest (RPIs) would equate with an equitable estoppel. (*Seymour* v. *Oelrichs* (1909) 156 Cal. 782, 794 [106 P. 88]; *Associated Creditors' Agency* v. *Haley Land Co.* (1966) 239 Cal.App.2d 610 [49 Cal.Rptr. 1].)[2]

For the purpose of this decision we assume the truth of the evidence (recited below) upon which RPIs rely to support their claim of equitable estoppel as supplemented only by the uncontradicted facts in the record and conclude there is no basis for the application of that principle.

Some days prior to January 22, 1978, RPIs Edward and Eileen Ku and Walter and Regina Yuan (Mrs. Ku and Mr. Yuan are brother and sister) contacted petitioner Jack Tobin, agent for petitioner Oren Realty & Development Company, Inc., to negotiate the purchase of two adjoining houses under construction. Mr. Tobin was told in pertinent part that Mrs. Ku and Mrs. Yuan were severally pregnant. The families were anxious to purchase, with changes to be agreed upon, the subject houses prior to the birth of their children. Close family ties made it essential to the Kus and Yuans that their houses be adjoining; for several years prior to and during the negotiations herein mentioned, they lived in adjoining homes respectively owned and severally occupied by each.[3] The mother of Mrs. Ku and Mr. Yuan lives with the Yuans but cares for the Ku's children.

---

[1]The pertinent portion of Civil Code. section 1624. subdivision 4. reads as follows:
"The following contracts are invalid, unless the same, or some note or memorandum thereof, is in writing and subscribed by the party to be charged or by his agent:
"⋯
"(4) An agreement for the leasing for a longer period than one year, or for the sale of real property, or of an interest therein; and such agreement, if made by an agent of the party sought to be charged, is invalid, unless the authority of the agent is in writing, subscribed by the party sought to be charged: . . . ."
The present statute of frauds (Civ. Code, § 1624; Code Civ. Proc., § 1971) is California's latest refinement of the seminal statute enacted in England on April 16, 1677. (See 6 Holdsworth, History of English Law, pp. 384-85.)

[2]This traditional defense was initiated in the English chancery court to indicate its position as to the statute of frauds almost concurrently with the enactment of the statute of frauds. (6 Holdsworth, History of English Law, *supra*, p. 393.)

[3]We here note that the deposition of one of RPIs introduced in evidence in proceedings on the motion shows in pertinent part:

On this initial meeting prices were discussed and RPIs stated to Tobin there was a possibility that a third party, a close friend and business associate might purchase a home near the two purchased by RPIs and that there could be a sale of three houses. Tobin stated that if three sales were made they would be able to purchase at a lower price which he quoted and upon the basis of which the parties negotiated the purchase price. RPIs and Tobin then discussed changes from plans and specifications on two adjoining houses.

Some days later, at approximately 10 a.m. on January 22, 1978, the Kus and Yuans met Mr. Tobin at his offices and went to the selected homesites to further discuss desired changes. The same morning they informed Mr. Tobin that the third party had not yet decided to purchase a home, and as a result any deal consummated between the parties could not be made contingent upon such third sale. Mr. Tobin was at first reluctant, but subsequently agreed that the sales would not be contingent upon the sale of a home to the third party.

The Kus and the Yuans returned as requested by Mr. Tobin at 2 p.m. of the same day. Mr. Tobin then repudiated his earlier statement and stated that the offers at the agreed upon prices would be contingent upon a third sale. The Kus and Yuans started to leave Mr. Tobin's office; he asked them to wait, stating that he would telephone Mr. Oren to see if Oren would be willing to accept a noncontingent sale at the negotiated prices; Mr. Tobin proceeded to another room, returned a few minutes later, and informed the Kus and Yuans that Mr. Oren had accepted their offer. In reliance upon Mr. Tobin's representations that Mr. Oren would be willing to accept their offer, Mr. Ku and Mr. Yuan severally signed their respective "offers." The offers were dated 1/22/78. Neither of the wives nor did either of the petitioners sign either of the offers. The record does not show Mr. Tobin had written authority to act for Oren but we assume he did have. The offers were not then or at any time signed by Tobin. Each offer required payment of $5,000 concurrently with the

---

"Q. I gather you have not sold the residence that you're living in?

"A. Not yet and it puts me in a very awkward situation.

"Q. You did not enter into any agreements to sell your house to anyone within the last year; is that correct?

"A. That's correct.

"Q. When did you acquire the house that you're now living in?

"A. I think over four years—around four years. That would be '74.

"Q. Okay. I just want to know the approximate date."

acceptance thereof but said payments were not made when the offers were signed.

Within two days the RPIs received escrow instructions and made an appointment to further inspect the homesites on January 27, 1978, and further discuss custom changes on the homes. Mr. Ku left for the Orient that afternoon and returned to Los Angeles on Thursday, February 2, 1978. On February 6, 1978, the RPIs executed their respective checks for $5,000 each and "prepared to send them along" to Occidental Escrow. On February 7, 1978, Occidental returned those checks of $5,000 each, stating that since the escrow instructions had not been signed the funds were being returned.

Although RPIs contend in their brief: ". . . when the initial deposit of real parties in interest was returned to them by Occidental Escrow, at the request of Oren Realty, the letter accompanying said return indicated that the return resulted from the fact that Escrow Instructions had not been executed by buyer or seller, *and made no mention of the fact that the 'offers' were allegedly not accepted*; . . . the 'offer' form which was prepared by petitioners makes no mention of any contingency as alleged by petitioners." The emphasized portion of the excerpt is cleared up by RPI Ku's testimony: "At no time prior to February 7, 1978, had I been told or informed that our offers had not been accepted or that the sale of our homes was contingent upon the third sale." As pointed out above, Occidental returned their initial checks to RPIs on February 7. On the following day, RPIs delivered to Occidental new checks dated February 8. The February 8 checks were thereafter held by Occidental upon RPIs' instructions who informed Occidental they intended to sue in specific performance.

In *Associated Creditors' Agency* v. *Haley Land Co.* (1966) 239 Cal.App.2d 610 [49 Cal.Rptr. 1], the court says at page 617: "The doctrine of estoppel to assert the statute of frauds is invoked to prevent fraud that inheres in unconscionable injury that would result from denying enforcement of the oral contract after one party has been induced by the other *seriously* to change his position in reliance upon the oral contract." (Italics added.)

In *Associated Creditors' Agency, supra,* Wesley Mart and John Zacker, a partnership (Mart) sold its bar and restaurant known as the Carriage

House in order to open a bar and restaurant at El Campo Golf Club, Inc., which was owned or controlled by Haley Land Company. The officers of Haley had represented to Mart that they would cause the corporation to lease the bar and restaurant to Mart and to transfer to Mart the on-sale liquor license. After months of operation, El Campo (controlled by Haley) notified Mart that it would not enter into a lease with Mart until Mart had the liquor license owned by Haley. The license was not forthcoming, and Haley was secretly, without notice to Mart, seeking to sell all of its interest in El Campo.

Illustrating further the change of position required is the case of *Seymour v. Oelrichs* (1909) 156 Cal. 782, 794 [106 P. 88], wherein estoppel turns upon a substantial change of position on the part of the plaintiff. In *Seymour, supra,* the plaintiff was orally offered a 10-year contract as overseer for defendant property owners, which he accepted with the understanding that the contract was to be reduced to writing. He gave up the position which he held, went to work and served for a number of years, and was discharged before the 10-year term. Under these circumstances, the change of position was held sufficient to create an estoppel.

■ Grounds for estoppel urged by RPIs are part performance through their transmittal of checks in down payment, loss of opportunity to find adjoining homesites and pregnancy of their respective wives. It is clear none of these is sufficient for the purpose. ■ "Before a party can be estopped to assert the statute [of frauds] due to the other's part performance, it must appear that a sufficient change of position has occurred so that the application of the statutory bar would result in an unjust and unconscionable loss, amounting in effect to a fraud. . . . The payment of money is not 'sufficient part performance to take an oral agreement out of the statute of frauds' . . . , for the party paying money 'under an invalid contract . . . has an adequate. remedy at law.' " (*Anderson v. Stansbury* (1952) 38 Cal.2d .707 [242 P.2d 305]; *Contreras v. Loya* (1961) 192 Cal.App.2d 176 [13 Cal.Rptr. 233]; *Gaglione v. Coolidge* (1955) 134 Cal.App.2d 518 [286 P.2d 568]; *Estes v. Hardesty* (1944) 66 Cal.App.2d 747 [152 P.2d 772].) ■ Similarly, "The alleged loss of opportunities to purchase other land does not amount to a change of position on the part of appellants. . . . It is illustrative of the manner in which injury . . . may have flowed from loss of the alleged bargain; but loss of bargain, and damage resulting therefrom, do not of themselves estop a seller from relying on the statute of frauds." (*Carlson v. Richardson* (1968) 267 Cal.App.2d 204 [72 Cal.Rptr. 769].)

On this facet of the claimed estoppel it is clear that the elapsed time between the date upon which RPIs thought they had a contract, to wit, January 22, and February 7, the day they knew they didn't have a written contract, was approximately 16 days. Argument that so brief a span of time interfered with effective shopping for adjoining homesites is a mere assertion. No proof was offered or heard on that subject and it is not one of which the court can take judicial notice nor was the court asked to take such notice.

RPIs advised Tobin their wives were severally pregnant and expected to inhabit the homesites for which they were contracting prior to the birth of the expected children. We infer as there is nothing in the record to the contrary, that petitioners through Tobin implicitly agreed to meet that expectation. However, the pregnant wives were and had been during all the negotiations and the litigation thereafter initiated, comfortably situated in adjoining homes in which they had respectively lived for approximately four years, and admittedly these homes were accessible to RPI Ku's mother-in-law. Said homes had not been sold and there was no agreement for sale thereof. It should be noted too that the pregnancy of the wives was a fact before January 22, 1978. The motion for summary judgment was made in September 1978 and not decided until November 1978 and in the natural and normal course of events, the expected children were delivered before the entry of judgment. However, there is nothing in the record which shows that RPIs or their wives suffered even remote discomfort, inconvenience or any type of legal damage.

No facet of the record shows unfair dealing or fraud inducing an ". . . unconscionable injury that would result from denying enforcement of the contract after one party has been induced by the other seriously to change his position in reliance on the contract . . . or in the unjust enrichment that would result if a party who has received the benefits of the other's performance were allowed to rely upon the statute." (*Monarco* v. *Lo Greco* (1950) 35 Cal.2d 621, 623-24 [220 P.2d 737]. In this connection we add there were no inducements to complete a transaction made by petitioners. RPIs on their testimony made a representation that a sale to them might include a third sale on the strength of which they were quoted a reduced price. When petitioners were advised there would be no third sale they rejected the offers on two occasions but thereafter withdrew the rejections. However, within a few days after reconsidering their second rejection and before any documents were executed by all the contracting parties, petitioners finally and firmly changed their minds which on the facts before us they had a legal and moral right to do.

Let a peremptory writ of mandate issue requiring respondent court to vacate its order of November 8, 1978, denying the motion of the defendants and petitioners for summary judgment, and to enter an order granting said motion.

Compton, J., and Beach, J., concurred.

A petition for a rehearing was denied April 27, 1979, and the petitions of the real parties in interest for a hearing by the Supreme Court were denied May 24, 1979.